Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

~~JANUARY 29~~ 20 14

WILLIAM M. McCOOL, Clerk

By _____ Deputy

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DICKSON LEE,<br><br>Defendant. | NO. CR14 024 RAJ<br><br>INDICTMENT<br><br>Counts 1-6: 18 U.S.C. § 1348<br>Counts 7-9: 18 U.S.C. § 1350<br>Count 10: 15 U.S.C. § 78m(a) and 78ff |

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment:

**A.   L&L Energy, Inc.**

1.      L&L Energy, Inc. (hereinafter, "L&L") was initially formed as a Nevada corporation in 1999, under the name "Royal Coronado Co. Ltd." Royal Coronado Co. Ltd. was formed as a shell corporation and conducted no business of its own. In 2001, Royal Coronado Co. Ltd. acquired all the shares of a British Virgin Islands corporation, originally founded by DICKSON LEE, known as L&L Investment Holdings, Inc. Subsequently, Royal Coronado Co. Ltd. changed its name to L&L Financial Holdings. In 2008, the company changed its name to L&L International Holdings, Inc. In 2009, the company assumed its current name, L&L Energy, Inc.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2.      L&L describes itself to be a coal company, engaged in various aspects of the coal business including mining, washing, and wholesale distribution, all within the People's Republic of China.  L&L maintained a U.S. corporate office at 130 Andover Park East, Suite 200, in Seattle, Washington.

3.      L&L first became a public reporting company subject to the United States Securities and Exchange Commission's (the "SEC's") periodic filing requirements in 2001, pursuant to a registration under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*).  On or about February 18, 2008, common stock of L&L qualified to be quoted on the Over-The-Counter Bulletin Board ("OTCBB"), and on or about August 2, 2008, it began trading under the symbol "LLFH."  L&L applied to list its stock with NASDAQ in September 2009.  In February 2010, L&L commenced trading on the NASDAQ Global Market under the symbol "LLEN."

4.      The successful NASDAQ listing was beneficial to L&L's share price. Shares of L&L debuted on the OTCBB at $2.50 per share.  Once L&L began trading on the NASDAQ, L&L's share price reached an all-time high on or about April 6, 2010, of approximately $14.29 per share.  At that price, with approximately 28 million common shares issued and outstanding, L&L could boast of a market capitalization of approximately $411,433,893.

5.      On or about November 18, 2013, NASDAQ halted all trading in L&L's common shares.  The closing price of L&L shares the day before the halt was approximately $1.68 per share.

**B.     Defendant Dickson Lee.**

6.      Defendant DICKSON LEE is the Chief Executive Officer and the Chairman of the Board of Directors of L&L.  DICKSON LEE founded the predecessor companies that eventually became L&L.  According to the 2012 Proxy Statement filed with the SEC and provided to shareholders, DICKSON LEE was "trained by KPMG and other U.S. companies in New York" and "obtained his New York CPA in 1983."  In prior Proxy Statements, DICKSON LEE represented that he had "extensive management

Indictment/Dickson Lee - 2

experience with KPMG and other US companies" and that he held a CPA license from the State of Washington.  In other publicly filed statements, DICKSON LEE represented that he was a "former Director of Verizon."

7.      DICKSON LEE has held the offices of CEO and Chairman of the Board for most of L&L's history, with the exception of an approximately one-year period.  In about August 2007, DICKSON LEE voluntarily resigned as CEO.  DICKSON LEE was reappointed as CEO in August 2008, and voted Chairman of the Board in January 2009.

**C.      Relevant Members of L&L Board of Directors and Other Executives.**

*(1) P.L. – L&L interim C.E.O. from 2007-2008.*

8.      P.L. is the brother of DICKSON LEE.  In about March 2006, P.L. was appointed a member of the Board of Directors of L&L.

9.      On about August 15, 2007, DICKSON LEE publicly announced his voluntary resignation as CEO of L&L for "personal reasons," and P.L. was appointed interim CEO.  P.L. was made to understand by DICKSON LEE that the appointment was temporary and that P.L. would do no substantive work and make no decisions on behalf of the company.  During the time when P.L. held the title of CEO, DICKSON LEE continued to make the day-to-day decisions on behalf of the company.  DICKSON LEE was formally reappointed CEO on or about August 25, 2008.

10.      P.L. possessed no training or experience managing or operating a public company.  P.L. also possessed no training or experience in public accounting or financial reporting.  At all times relevant to this Indictment, P.L.'s full time occupation was operating a self-owned insurance business in the State of Michigan.

*(2) S.K. – L&L Director and Chair of Audit Committee.*

11.      S.K. was appointed an Independent Director of L&L's Board on or about March 1, 2004, after having been associated with L&L's predecessor companies in various capacities since 1998.  In its filings, L&L described S.K. as a senior executive with over 20 years of experience in corporate governance, corporate management, and financial analysis for various high-tech firms in Silicon Valley, California, and Asia.  In

Indictment/Dickson Lee - 3

1    March 2008, L&L announced the appointment of S.K. as Chair of the newly formed

2    Audit Committee.  S.K. held the position of Audit Committee Chair until sometime in

3    November 2009.

4         *(3) N.L. – L&L employee from 1997 – 2004.*

5         12.    N.L., (a.k.a. K.Y.L.), according to L&L's SEC filings, was first appointed

6    in or about June 1997 as "CFO and comptroller" of a predecessor company of L&L.

7    L&L's filings described N.L.'s experience as including work as a senior auditing

8    manager for a "New York CPA firm," and as an executive with Hang Seng Bank of Hong

9    Kong.  N.L. was described as having graduated with a Business Commerce degree from

10   Woolongan University of Australia, and as an Australian Certified Public Accountant, a

11   member of the Australian Society of Certified Public Accountants, and a member of the

12   Hong Kong Society of Accountants.  At all times relevant to this Indictment, N.L. resided

13   in Hong Kong.

14        13.    On or about September 28, 2003, L&L announced that N.L. had been

15   appointed to L&L's Board of Directors.  On or about May 28, 2004, L&L disclosed that

16   N.L. had resigned as "Comptroller," but remained a Board Member.  On or about March

17   3, 2006, L&L reported that N.L. had also resigned from the Board.

18        *(4) G.B. – L&L C.F.O. from March 2008 through May 2008.*

19        14.    G.B. was appointed L&L's Chief Financial Officer on or about March 1,

20   2008.  In about May 2008, DICKSON LEE became aware of allegations that G.B. had

21   been dishonest about his educational and professional credentials with other companies,

22   and that institutional investors distrusted L&L for hiring G.B.  On or about May 7, 2008,

23   L&L announced that G.B. had resigned his position as CFO for L&L and that a

24   replacement was being sought.

25   **D.    Securities Laws Regarding Public Filings and Certification**
           **Requirements.**
26

27        15.    The SEC is an agency within the executive branch of the United States

28   government.  The SEC is empowered to investigate violations of and enforce federal

Indictment/Dickson Lee - 4

1  securities laws, regulations, and rules governing the public reporting of information about

2  publicly traded companies.  Among other things, the purpose of these laws, regulations,

3  and rules is to ensure that publicly traded companies disclose to the investing public

4  material facts impacting company operations.

5        16.     As a company with a class of stock registered and subject to registration

6  pursuant to Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), L&L

7  was required to comply with various laws, rules and regulations pertaining to the form

8  and content of public disclosures.  Under the SEC's rules and regulations, registrants

9  such as L&L are required to file on schedule certain annual (Form 10-K) and quarterly

10  (Form 10-Q) reports that disclose to the investing public the companies' current financial

11  condition and results of operations.

12        17.     As of 2002, SEC's rules and regulations furthermore required that every

13  annual and quarterly report be accompanied by written certifications executed by the

14  Chief Executive Officer and the Chief Financial Officer, or their equivalents, attesting to

15  the accuracy and reliability of the contents of the reports.  The certification requirements

16  were mandated by the United States Congress in the Sarbanes-Oxley Act of 2002.

17  Among other things, the purpose of the Act was to protect investors by improving the

18  accuracy and reliability of corporate reports, and to ensure that executives are held

19  personally responsible for the financial statements.

20        18.     Specifically, the Sarbanes-Oxley Act and the attendant SEC rules and

21  regulations require that each annual and quarterly report be accompanied by two separate

22  certifications.  The first certification, known commonly as the "Section 302

23  Certification," requires the CEO and CFO, or their equivalents, each to affirm in writing,

24  in substance, the following:

25            a.     The attesting officer reviewed the report;

26            b.     Based on the officer's knowledge, the report does not contain any

27  false or misleading statement material to an investor;

28

Indictment/Dickson Lee - 5

1          c.     The two certifying officers together are responsible for establishing

2    and maintaining the company's internal controls and procedures to ensure that

3    information material to investors is disclosed, and that financial statements are accurate;

4    and

5          d.     The two certifying officers have disclosed any material weaknesses

6    in the internal controls as well as any fraud that involves management or other employees

7    who have a significant role in the registrant's internal control over financial reporting.

8        19.    The second certification, known commonly as the "Section 906

9    Certification," requires the CEO and the CFO, or their equivalents, each to affirm, in

10   substance, the following:

11         a.     The report fully complies with the applicable laws and regulations

12   governing such periodic reports; and

13         b.     The information contained in the report fairly presents in all material

14   aspects, the financial condition and results of operation of the company.

15       20.    L&L's Form 10-Ks and Form 10-Qs were electronically submitted from

16   L&L's headquarters in Seattle, Washington, utilizing the SEC's Electronic Data

17   Gathering, Analysis and Retrieval (EDGAR) System.  Because filings through the

18   EDGAR system are submitted electronically, they are not required to include the actual

19   manual signatures of the required signatories to the reports, including the signatures for

20   the Section 302 and Section 906 Certifications.  Instead, the filings include simply the

21   typed name of the individual in the place where ordinarily the signature would be found

22   to indicate that the person has signed.  However, SEC rules and regulations require that

23   each signatory manually sign a signature page or other document authenticating,

24   acknowledging or otherwise adopting his or her signature that appears in typed form

25   within the electronically filed report.  Such documents are to be executed before or at the

26   time the electronic filing is made and must be retained by the company for at least five

27   years.

28

Indictment/Dickson Lee - 6

21.     Once companies such as L&L file their reports through EDGAR, such reports and accompanying certifications are available to the public to be reviewed and relied upon in making investment decisions.

22.     DICKSON LEE, as a result of his experience and position with L&L, had knowledge of SEC filing requirements, including the Section 302 and 906 Certifications requirements.  Since 2001, when L&L became subject to SEC reporting requirements, DICKSON LEE has been involved in preparing, reviewing and certifying as the CEO every annual and quarterly filing, along with the attendant Section 302 and 906 Certifications, on behalf of L&L, with the exception of two annual reports and three quarterly reports for the time period between 2007 and 2008.  From August 2007 to about August 2008, L&L's annual and quarterly reports purportedly were submitted under the signature of P.L. in his capacity as interim CEO.  However, even during the time period when P.L. was interim CEO, DICKSON LEE continued to be involved in preparing, reviewing and approving L&L's SEC filings.

**E.     Requirements for Quotation on the OTCBB.**

23.     L&L common stock was first accepted for quotation through the OTCBB quotation service on or about February 18, 2008, and began actively trading on or about August 8, 2008.  The OTCBB is an electronic quotation system that displays real-time quotes, last-sale prices, and volume information for stocks of companies that are not listed on a national securities exchange.  Once a stock is quoted through the OTCBB, the public can buy and sell the company's stock through a broker in a manner similar to those listed on an exchange.

24.     The OTCBB is regulated by the Financial Industry Regulatory Authority ("FINRA"), an independent regulator for securities firms doing business in the United States.  In order for a company to become eligible for OTCBB trading, FINRA requires the company to be registered with the SEC and to be current in its SEC filings pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  An OTCBB issuer that becomes delinquent in its required regulatory filings will have its securities removed

Indictment/Dickson Lee - 7

1  from the OTCBB.  An OTCBB issuer will be deemed delinquent in its reporting

2  obligations if the issuer fails to make a required filing when due or has filed an

3  incomplete filing.  In order for a company's filing to be considered complete, all such

4  filings must be accompanied by the requisite certifications and attestations as to the

5  accuracy of the filings by the company's officers as proscribed by law and SEC rules and

6  regulations.

7  **F.    Requirements for Listing on the NASDAQ.**

8      25.    On or about September 5, 2009, L&L applied to list its common stock with

9  NASDAQ, a national securities exchange.  On about February 10, 2010, L&L received

10  approval for NASDAQ listing, and on or about February 18, 2010, L&L common shares

11  began trading on the NASDAQ.

12      26.    In order to qualify for listing on the NASDAQ, companies have to meet

13  criteria beyond those required for OTCBB.  First, companies must meet quantitative

14  revenue and liquidity requirements.  For example, for listing on the NASDAQ Global

15  Market exchange, the specific exchange where L&L was first listed, a company must

16  have total revenue of at least $75 million, have at least 1.1 million shares outstanding,

17  and its stock must have  reached a price of at least $4 per share for a sustained period.

18  Second, a company also must meet certain qualitative criteria, including establishment of

19  an independent Board of Directors and formal committees.  Finally, as with the OTCBB,

20  companies listing on the NASDAQ must demonstrate compliance with all SEC reporting

21  and filing requirements.

**COUNTS 1 - 6**
**(Securities Fraud)**

24      27.    The Grand Jury hereby realleges and incorporates by reference paragraphs

25  1 through 26 of this Indictment as though fully set forth herein.

26      28.    Beginning no later than in or about July 2008, and continuing through in or

27  about February 2010, in Seattle, Washington, within the Western District of Washington

28  and elsewhere, the defendant, DICKSON LEE, together with others known and unknown

Indictment/Dickson Lee - 8

1  to the Grand Jury, knowingly and with intent to defraud, executed, attempted to execute,

2  and aided and abetted the execution of a scheme and artifice to defraud investors and

3  others, including the NASDAQ, as to material matters in connection with the securities of

4  L&L, an issuer of securities registered under section 12 of the Securities Exchange Act of

5  1934 and which was required to file reports under Section 15(d) of the Securities

6  Exchange Act of 1934, and to obtain, by means of materially false and fraudulent

7  pretenses, representations, and promises, any money and property in connection with the

8  purchase or sale of securities of L&L, an issuer of securities registered under section 12

9  of the Securities Exchange Act of 1934 and which was required to file reports under

10 Section 15(d) of the Securities Exchange Act of 1934.

11 **A.    Essence of the Scheme**

12        29.    Beginning in early 2008, defendant DICKSON LEE sought to raise funds

13 from individual and institutional investors for L&L's operations through the sale and

14 pledge of L&L stock.  DICKSON LEE was aware that investors would be more willing

15 to fund L&L if (1) he could present L&L as an established and trustworthy company,

16 managed by a professional executive team that included a CFO; and (2) L&L stock was

17 publicly traded on a national securities exchange such as the NASDAQ.

18        30.    Sometime in May and June 2008, DICKSON LEE approached N.L., a

19 Hong Kong resident and former employee of L&L, to offer the position of temporary

20 Acting CFO.  But, in July of 2008, just a few weeks before L&L had to prepare, finalize,

21 and submit L&L's required annual report with the SEC, N.L. expressly declined to accept

22 the job.

23        31.    Rather than disclose that L&L had no CFO, DICKSON LEE submitted and

24 caused to be submitted a series of false, fraudulent and misleading corporate filings with

25 the SEC that identified N.L. as the company's CFO.  The filings included fraudulent

26 Section 302 and 906 Certifications that falsely claimed that N.L, together with the CEO,

27 performed specific tasks designed to guard against fraud and improve the accuracy of the

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 company's financial statements, whereas, in truth and fact, N.L. had nothing to do with

2 L&L during the relevant time period.

3       32.    In May 2009, N.L. discovered that L&L had falsely and without her

4 permission represented that she was L&L's Acting CFO. In order to prevent public

5 disclosure of the fraud, DICKSON LEE entered into an agreement with N.L. to pay her

6 cash and stock in return for N.L.'s silence. Thereafter, DICKSON LEE caused L&L to

7 file an annual report under the name of a new Acting CFO, omitting all mention of N.L.

8 and the payments of company cash and stock made to N.L. Instead, the filing included a

9 false certification in which DICKSON LEE misleadingly affirmed that he had fully

10 disclosed any fraud that involved management.

11       33.    Finally, in September 2009, DICKSON LEE and L&L submitted an

12 application for listing on the NASDAQ. As part of the application process, NASDAQ

13 requested that the company confirm historical compliance with SEC filing regulations.

14 DICKSON LEE knowingly and falsely represented to the NASDAQ that L&L had

15 complied, even though he knew that all the prior submissions that were filed in the name

16 of N.L. were fraudulent and not in compliance with filing regulations. After deceiving

17 the NASDAQ, in February 2010, L&L successfully debuted on the NASDAQ exchange.

18 **B.    Manner and Means of the Scheme**

19       34.    It was part of the scheme and artifice that throughout 2008, DICKSON

20 LEE sought on behalf of L&L funding from various investors, including large investment

21 firms, banks and other institutional investors, in the United States and abroad, in

22 exchange for an offering or pledge of L&L shares. DICKSON LEE understood that the

23 most effective way to attract such funding was to eventually list L&L on a national

24 securities exchange such as the NASDAQ. DICKSON LEE also understood that

25 investors preferred that L&L be managed by a complete and professional executive team

26 that included a CFO, an officer tasked with managing the finances and overseeing the

27 financial reporting for the company. That is because the presence of a CFO would

28 confirm that the company had become sufficiently established and large enough to

Indictment/Dickson Lee - 10

warrant a complete and professional executive team, bolstering the company's credibility

with investors, and provide further assurances as to the accuracy and reliability of the

company's public filings and financial statements.

35.     It was further a part of the scheme and artifice that in order to attract such

investors, DICKSON LEE and L&L applied for and received approval for quotation

through the OTCBB in February 2008, and commenced public trading on or about

August 2, 2008. DICKSON LEE and L&L intended to use the OTCBB as a first step to

enlarge the shareholder base and raise the stock price, so that the company could qualify

for a national exchange listing. DICKSON LEE knew and understood that one of the

criteria that L&L would have to meet to qualify for the NASDAQ would be to have L&L

shares trade on the OTCBB for some sustained period of time at a minimum of $4 per

share.

36.     It was further a part of the scheme and artifice that in order to attract

investors, on or about February 29, 2008, L&L announced the hiring of a formal CFO,

G.B., effective March 1, 2008. Shortly after announcing the appointment, DICKSON

LEE discovered that G.B. had been dishonest about his educational and professional

credentials. DICKSON LEE was also aware that G.B. had served on the Board of

another publicly traded company, and that the company's share prices had suffered sharp

losses when G.B.'s background was exposed.  DICKSON LEE was informed that

institutional investors would not consider investing in L&L with G.B. as CFO.  On or

about May 7, 2008, L&L announced the departure of G.B.

37.     It was further a part of the scheme and artifice that after the resignation of

G.B., DICKSON LEE was aware that L&L had to install a new CFO at the soonest

opportunity.   At least one institutional investor conditioned further discussions with L&L

on the company having in place a CFO. DICKSON LEE, however, was not successful in

recruiting a U.S.-based individual to replace G.B.

Indictment/Dickson Lee - 11

38.     It was further a part of the scheme and artifice that DICKSON LEE, sometime in April or May of 2008, discussed with N.L. in Hong Kong the possibility of N.L. being appointed CFO on a temporary basis for L&L.

39.     It was further a part of the scheme and artifice that, on or about June 23, 2008, after the resignation of G.B., DICKSON LEE informed members of L&L's Board of Directors, including S.K., that N.L. was willing to become acting CFO, and sought their approval to appoint N.L.  The Board, without meeting or communicating directly with N.L., approved the appointment.

40.     It was further a part of the scheme and artifice that on or about June 23, 2008, DICKSON LEE caused to be sent an email to N.L. thanking her for becoming L&L's acting CFO and informing her that the Board had approved her appointment.

41.     It was further a part of the scheme and artifice that on or about July 14, 2008, DICKSON LEE received an email from N.L. wherein N.L. stated that she was "unable to become L&L Acting CFO."  Thereafter, N.L. performed no work for L&L in any capacity.  Neither did N.L. sign or agree to sign any of the required certifications attesting to the accuracy and reliability of L&L's annual or quarterly reports submitted to the SEC after July 2008.

42.     It was further a part of the scheme and artifice that L&L shares commenced trading through the OTCBB on or about August 4, 2008.  The opening price per share was $2.50.

43.     It was further a part of the scheme and artifice that DICKSON LEE did not inform anyone at L&L about N.L.'s rejection of the CFO position.  To the contrary, DICKSON LEE knowingly and falsely represented or caused to be represented that N.L. had assumed the position of Acting CFO on behalf of L&L and was performing the duties of that position from Hong Kong.

44.     It was further a part of the scheme and artifice that when S.K., as a member of L&L's Board of Directors, expressed concern to DICKSON LEE about N.L.'s capacity to perform her duties as L&L's CFO while based in Hong Kong, DICKSON

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  LEE assured S.K. that some of the work could be performed remotely by N.L., and that
2  any work that N.L. could not do, DICKSON LEE would do himself.  DICKSON LEE
3  further confided in S.K. that it was more important that L&L be able to use N.L.'s name
4  as CFO than that N.L. do actual work as CFO.

5        45.    It was further a part of the scheme and artifice that on or about August 13,
6  2008, DICKSON LEE knowingly caused L&L to submit electronically to the SEC from
7  L&L's offices in Seattle, Washington, its annual report (Form-10K) for the fiscal year
8  ended April 30, 2008, containing the following false, fraudulent and misleading
9  representations:

10         a.    that N.L. became Acting CFO after G.B.'s resignation in May 2008;
11         b.    a Section 302 Certification, purportedly certified by N.L. as Acting
12               CFO; and
13         c.    a Section 906 Certification, purportedly certified by N.L. as Acting
14               CFO;
15 whereas, in truth and fact, as DICKSON LEE well knew, N.L. was not L&L's Acting
16 CFO; N.L. did not review the Form 10-K; N.L. did none of the work required to be able
17 to personally affirm the Sections 302 and 906 Certifications; and N.L. did not certify or
18 authorize anyone to certify on her behalf the Section 302 and 906 Certifications.

19       46.    It was further a part of the scheme and artifice that on or about August 13,
20 2008, DICKSON LEE knowingly caused L&L to submit electronically to the SEC from
21 L&L's offices in Seattle, Washington, its annual report (Form -10K) for the fiscal year
22 ended April 30, 2008, containing the following false, fraudulent and misleading
23 representations:

24         a.    a Section 302 Certification, purportedly by P.L. in his capacity as
25               interim CEO; and
26         b.    a Section 906 Certification, purportedly certified by P.L. in his
27               capacity as interim CEO;
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 whereas, in truth and fact, as DICKSON LEE well knew, P.L. did not certify or agree to

2 certify the Section 302 and 906 Certifications on behalf of L&L, and did not and could

3 not attest to the matters required in the Section 302 and 906 Certifications.  DICKSON

4 LEE knew and understood that P.L. did no substantive work as CEO during the period

5 covered by the Form 10-K and that P.L. was not even aware that his name was being

6 used for the purpose of making the Section 302 and 906 Certifications.

7      47.    It was further a part of the scheme and artifice that on or about August 25,

8 2008, DICKSON LEE re-assumed the title of CEO of L&L.

9      48.    It was further a part of the scheme and artifice that on or about September

10 15, 2008, DICKSON LEE knowingly and with intent to defraud caused L&L to submit

11 electronically to the SEC from L&L's offices in Seattle, Washington, a quarterly report

12 (Form 10-Q) for the quarter ended July 31, 2008, containing the following false,

13 fraudulent, and misleading representations:

14        a.    a Section 302 Certification, purportedly certified by N.L. as Acting

15             CFO;

16        b.    a Section 906 Certification, purportedly certified by N.L. as Acting

17             CFO;

18        c.    a Section 302 Certification by DICKSON LEE representing

19             i.    that he and N.L. together were responsible for L&L's internal

20                 controls and disclosure procedures; and

21             ii.    that he had disclosed all material weaknesses in the internal

22                 controls and any fraud by management; and

23        d.    a Section 906 Certification by DICKSON LEE confirming that the

24             filing complied with applicable laws;

25 whereas, in truth and fact, as DICKSON LEE well knew, N.L. was not L&L's Acting

26 CFO; N.L. did not review the Form 10-Q; N.L. did none of the work required to be able

27 to personally affirm the Sections 302 and 906 Certifications; N.L. did not certify or

28 authorize anyone to certify on her behalf the Section 302 and 906 Certifications;

Indictment/Dickson Lee - 14

1  furthermore, DICKSON LEE did not work with N.L. to ensure the accuracy and

2  reliability of the company's filings, and did not reveal the fraud that he, as CEO, was

3  perpetrating upon the investing public by continuing to pretend that N.L. was performing

4  the duties of L&L's CFO, and the quarterly report was materially false in that respect.

5       49.    It was further a part of the scheme and artifice that on or about December

6  22, 2008, DICKSON LEE knowingly and with intent to defraud caused L&L to submit

7  electronically to the SEC from L&L's offices in Seattle, Washington, a quarterly report

8  (Form 10-Q) for the quarter ended October 31, 2008, containing the following false and

9  misleading representations:

  a.   a Section 302 Certification, purportedly certified by N.L. as Acting
10
11       CFO;

12 b.    a Section 906 Certification, purportedly certified by N.L. as Acting

13       CFO;

14 c.    a Section 302 Certification by DICKSON LEE representing

15       i.    that he and N.L. together were responsible for L&L's internal

16             controls and disclosure procedures; and

17       ii.   that he had disclosed all material weaknesses in internal

18             control and any fraud by management; and

19 d.    a Section 906 Certification by DICKSON LEE confirming that the

20       filing complied with applicable laws;

21 whereas, in truth and fact, as DICKSON LEE well knew, N.L. was not L&L's Acting

22 CFO; N.L. did not review the Form 10-Q; N.L. did none of the work required to be able

23 to personally affirm the Sections 302 and 906 Certifications; and N.L. did not certify or

24 authorize anyone to certify on her behalf the Section 302 and 906 Certifications;

25 furthermore, DICKSON LEE did not work with N.L. to ensure the accuracy and

26 reliability of the company's filings, and did not reveal the fraud that he, as CEO, was

27 perpetrating by continuing to pretend that N.L. was performing the duties of L&L's CFO,

28 and the quarterly report was materially false in that respect.

Indictment/Dickson Lee - 15

50.     It was further a part of the scheme and artifice that on or about March 23, 2009, DICKSON LEE knowingly and with intent to defraud caused L&L to submit electronically to the SEC from L&L's offices in Seattle, Washington, a quarterly report (Form 10-Q) for the quarter ended January 31, 2009, containing the following false and misleading representations:

        a.     a Section 302 Certification, purportedly certified by N.L. as Acting CFO;

        b.     a Section 906 Certification, purportedly certified by N.L. as Acting CFO;

        c.     a Section 302 Certification by DICKSON LEE representing

                i.     that he and N.L. together were responsible for L&L's internal controls and disclosure procedures; and

                ii.     that he had disclosed all material weaknesses in internal controls and any fraud by management; and

        d.     a Section 906 Certification by DICKSON LEE confirming that the filing complied with applicable laws;

whereas, in truth and fact, as DICKSON LEE well knew, N.L. was not L&L's Acting CFO; N.L. did not review the Form 10-Q; N.L. did none of the work required to be able to personally affirm the Sections 302 and 906 Certifications; and N.L. did not certify or authorize anyone to certify on her behalf the Section 302 and 906 Certifications; furthermore, DICKSON LEE did not work with N.L. to ensure the accuracy and reliability of the company's filings, and did not reveal the fraud that he, as CEO, was perpetrating by continuing to pretend that N.L. was performing the duties of L&L's CFO, and the quarterly report was materially false in that respect.

51.     It was further a part of the scheme and artifice that on or about May 6, 2009, N.L. discovered that her name was being used fraudulently to submit SEC annual and quarterly reports on behalf of L&L, and sent an email to DICKSON LEE demanding an explanation. N.L., at the same time, also sought payment from DICKSON LEE and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | L&L for additional compensation and stock she believed she was owed as a result of her

2 | former employment at L&L that terminated in 2004.

3 |     52.    It was further a part of the scheme and artifice that on or about May 19,

4 | 2008, DICKSON LEE responded to N.L. in an email acknowledging that N.L. "did not

5 | actually conduct the work as Acting," and sought to lull N.L. not to disclose this fact to

6 | others by suggesting that with "regard to any prior SEC filings, if you feel it necessary,

7 | our office can easily amend prior documents and remove your name from Acting." L&L

8 | and DICKSON LEE, however, never submitted any amended SEC filings or other

9 | documentation correcting past representations that N.L. was L&L's CFO, nor did

10 | DICKSON LEE ever intend to.

11 |     53.    It was further a part of the scheme and artifice that on or about May 21,

12 | 2009, N.L. began communicating with S.K. via email seeking assistance in disclosing to

13 | members of L&L's Board of Directors the fraudulent use of N.L.'s name. Upon receipt of

14 | N.L.'s communications, S.K. requested an explanation from DICKSON LEE. DICKSON

15 | LEE initially stated to S.K. that N.L. was simply attempting to pressure the company into

16 | paying her additional compensation and assured S.K. that N.L. had agreed to assume the

17 | Acting CFO role.

18 |     54.    It was further a part of the scheme and artifice that in or about May or June

19 | of 2009, in an attempt to further persuade S.K. as to the legitimacy of the company's

20 | representations regarding N.L., DICKSON LEE provided S.K. with the copy of a

21 | purported letter addressed and sent to N.L., dated May 28, 2008, which stated in part that

22 | N.L. "agreed to take the Acting CFO position of L&L" and requested permission to "use

23 | your name for the filing of certifications as L&L CFO-Acting, avoiding possible filing

24 | delays." The letter presented to S.K. appeared to have been signed by P.L. as CEO.

25 |     55.    It was further a part of the scheme and artifice that in truth and fact, P.L.

26 | did not write, sign or authorized to be signed on his behalf any such letter to N.L. The

27 | letter was created with the knowledge of DICKSON LEE in or about May 2009, not in

28 | 2008, for the purpose of misleading S.K. and others. As a result of DICKSON LEE's

Indictment/Dickson Lee - 17

1  explanation, S.K. did no further investigation of N.L.'s claims and did not inform other

2  members of L&L's Board of Directors.

3      56.     It was further a part of the scheme and artifice that on or about June 4,

4  2009, N.L. provided S.K. with further details of her allegations, including a copy of the

5  original email N.L. wrote to DICKSON LEE on or about July 14, 2008, declining to

6  accept the CFO position. After the receipt of this additional evidence, S.K. confronted

7  DICKSON LEE regarding the July 18, 2008, email. DICKSON LEE finally confided in

8  substance to S.K. that N.L. had not done any work as L&L's CFO, but explained that it

9  was too late to do anything about it. DICKSON LEE explained that a new CFO had been

10  selected so there would be no harm. DICKSON LEE expressed to S.K. specific concern

11  about damage to L&L's reputation and its share price if this matter regarding N.L. was

12  disclosed. DICKSON LEE explained to S.K. that he would take care of the situation, and

13  persuaded S.K. to not discuss the issue further with other members of the Board of

14  Directors. S.K. agreed to remain silent, and reported nothing to other Board members.

15      57.     It was further a part of the scheme and artifice that between on or about

16  July 21 and July 24, 2009, N.L. distributed over email to certain other members of the

17  Board of Directors of L&L, as well as the outside auditing firm engaged to conduct the

18  audit of L&L's books and records, a letter that N.L. proposed to send to the SEC alleging,

19  among other things, that L&L had falsely represented that N.L. had been L&L's Acting

20  CFO when in fact she was not. In response to N.L.'s email, DICKSON LEE falsely and

21  misleadingly assured other members of the Board and L&L's outside auditor, that N.L.

22  was simply a disgruntled former employee and that this was nothing more than a

23  compensation dispute. The Board and the outside auditor accepted DICKSON LEE's

24  explanation.

25      58.     It was further a part of the scheme and artifice that on or about July 30,

26  2009, DICKSON LEE, on behalf of L&L, entered into an agreement with N.L. whereby

27  L&L agreed to pay N.L. cash in installments totaling more than $50,000, and to issue in

28  N.L.'s name approximately 115,000 L&L common shares. The agreement, however,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   expressly conditioned the payments upon N.L. providing a signed written statement

2   promising to refrain from disclosing to others, including the SEC, L&L's fraudulent use

3   of N.L.'s name in past SEC filings.  The agreement also warned that if N.L. breached the

4   settlement by disclosing her allegations to others, she would suffer a significant financial

5   penalty.

6       59.     It was further a part of the scheme and artifice that shortly after the signing

7   of the agreement between N.L. and DICKSON LEE, on or about August 13, 2009, L&L

8   filed with the SEC its annual report (Form 10-K) for the fiscal year ended April 30, 2009.

9   Nowhere in the Form 10-K does the company disclose the truth about N.L., correct its

10  past misrepresentations, or disclose the fact that the company had entered into a

11  settlement with N.L. in return for N.L.'s silence.  The Form 10-K, furthermore, included a

12  Section 302 Certification, attested to by DICKSON LEE in his capacity as CEO, that he

13  had disclosed to the auditor and the audit committee any and all fraud involving

14  management, whereas, in truth and fact, as DICKSON LEE well knew, he actively

15  mislead the Board and the outside auditor about his own fraud.

16      60.     It was further a part of the scheme and artifice that L&L's financial

17  statements during the time period in which N.L. was falsely held out to be CFO reported

18  very favorable earnings.   In 2004, L&L had reported revenue of less than $600,000.

19  However, starting in 2008, L&L began to announce a steady stream of acquisitions and

20  joint ventures in the coal business, and corresponding accelerating rates of revenue

21  growth.   By fiscal year-end 2008, when N.L. was first falsely represented as L&L's

22  CFO, L&L reported total revenue of $32 million, a 69% rise from the prior year.   In the

23  three subsequent quarters in which N.L. continued to be falsely presented as L&L's CFO,

24  L&L reported ever larger revenues.  For the quarter ended July 31, 2008, L&L reported a

25  33% increase in revenue from the prior year period.  For the quarter ended October 31,

26  2008, L&L reported a 30% increase in revenues from the prior year period.  For the third

27  quarter ended January 31, 2009, L&L reported an 80% increase in revenue over the same

28

Indictment/Dickson Lee - 19

1   period in 2008.  By fiscal year-end 2009, L&L boasted of total revenue of $40 million, a

2   75% rise from the prior year.

3       61.   It was further a part of the scheme and artifice that on or about August 14,

4   2009, the day after L&L's 10K filing for the fiscal year-end 2009, L&L share price on the

5   OTCBB closed at what was then the historic high of $5.20 per share, with approximately

6   118,996 shares changing hands.  L&L share price continued to climb steadily throughout

7   the rest of 2009, permitting L&L to apply for listing on the NASDAQ.

8       62.   It was part of the scheme and artifice that on or about September 5, 2009,

9   DICKSON LEE, on behalf of L&L, submitted its initial application for listing L&L on

10   the NASDAQ.  As part of NASDAQ's application process, on or about September 30,

11   2009, a NASDAQ representative requested that L&L confirm compliance with securities

12   laws and regulations, specifically, that the company had "made all certifications to the

13   SEC required to date under sections 302 and 906 of the Sarbanes-Oxley Act."

14       63.   It was further a part of the scheme and artifice that DICKSON LEE was

15   aware that a condition of listing on the NASDAQ was demonstrated compliance with

16   securities laws and regulations, including the laws and regulations pertaining to the SEC

17   filing requirements.

18       64.   It was further a part of the scheme and artifice that on or about November

19   17, 2009, DICKSON LEE requested that J.E., an outside consultant engaged by L&L,

20   review the company's SEC filings for the fiscal year ended April 30, 2009, and quarter

21   ended July 31, 2009, for purposes of reviewing the requisite certifications.  J.E. complied

22   with the request and noted to DICKSON LEE the presence of the certifications for those

23   specific filings only.

24       65.   It was further a part of the scheme and artifice that on or about November

25   17, 2009, DICKSON LEE responded to J.E. that NASDAQ had requested that L&L

26   confirm they had made all certifications to date and thanked him for doing so.  J.E.,

27   however, replied clarifying that he had reviewed only the most recent filings, and that

28

Indictment/Dickson Lee - 20

1  DICKSON LEE and other L&L staff should undertake a review of all filings since 2002

2  when the Sarbanes-Oxley requirement first went into effect.

3          66.     It was further a part of the scheme and artifice that on or about November

4  19, 2009, DICKSON LEE, in his capacity as CEO of L&L, caused to be submitted from

5  L&L's office in Seattle, Washington, to NASDAQ a letter responding to various requests

6  for information in connection with the company's listing application.  Included in the

7  letter was the false and misleading confirmation that "[t]he Company has made all

8  certifications under section 302 and 906 of the Sarbanes-Oxley Act.  We have confirmed

9  this fact with [the outside consultant] engaged by L&L."   This statement was knowingly

10 false and misleading because DICKSON LEE knew that L&L had failed to make all

11 Section 302 and 906 certifications required under the law to date, since all such

12 certifications submitted in N.L.'s name as Acting CFO in the time period between August

13 2008 through March 2009, were false and fraudulent, and were not genuine certifications.

14         67.     It was further a part of the scheme and artifice that, as a result of L&L's

15 submission, L&L was accepted to be listed on the NASDAQ, and on or about February

16 18, 2010, commenced trading on the national exchange.  L&L shares debuted on the

17 NASDAQ at a share price of $7.51 per share.

18 **B.      Execution of the Scheme and Artifice**

19         68.     On or about the dates set forth below, in Seattle, within the Western District

20 of Washington, and elsewhere, having devised and participated in the above described

21 scheme and artifice, DICKSON LEE, for the purpose of executing, attempting to execute,

22 and aiding and abetting the execution of this scheme and artifice submitted and caused to

23 be submitted the following reports, statements, and documents, each of which contained

24 materially false, fraudulent, and misleading representations as described above, each

25 submission constituting a separate count of this Indictment:

26 //

27 //

28 //

Indictment/Dickson Lee - 21

| Count | Approximate Date of Filing | Submission |
|---|---|---|
| 1 | August 13, 2008 | L&L Annual Report (Form 10-K) for fiscal year ended April 30, 2008, submitted to the SEC |
| 2 | September 15, 2008 | L&L Quarterly Report (Form 10-Q) for quarter ended July 31, 2008, submitted to the SEC |
| 3 | December 22, 2008 | L&L Quarterly Report (Form 10-Q) for quarter ended October 31, 2008, submitted to the SEC |
| 4 | March 23, 2009 | L&L Quarterly Report (Form 10-Q) for quarter ended January 31, 2009, submitted to the SEC |
| 5 | August 13, 2009 | L&L Annual report (Form 10-K) for fiscal year ended April 30, 2009, submitted to the SEC |
| 6 | November 19, 2009 | November 19, 2009, letter to NASDAQ signed by DICKSON LEE |

All in violation of Title 18, United States Code, Sections 1348 and 2.

## COUNTS 7 THROUGH 9
### (False Certification of Financial Reports by Corporate Officer)

69.     The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 26 and 28 through 67 of this Indictment as though fully set forth herein.

70.     On or about the dates set forth below, in Seattle, within the Western District of Washington and elsewhere, the defendant, DICKSON LEE, together with others, did knowingly and willfully certify in writing statements accompanying periodic reports containing financial statements filed by an issuer with the Securities and Exchange Commission pursuant to section 13(a) and 15(d) of the Securities Exchange Act of 1934, knowing that each accompanying periodic report did not fully comply with the requirements of section 13(a) and 15(d) of the Securities Exchange Act of 1934, to wit:

Indictment/Dickson Lee - 22

the periodic reports listed below contained false statements about N.L., N.L.'s role at L&L, and N.L.'s responsibilities, and false and fraudulent Section 302 and 906 Certifications:

| Count | Approximate Date of Filing | SEC Report |
|---|---|---|
| 7 | Sep. 15, 2008 | L&L Quarterly Report (Form 10-Q) for quarter ended July 31, 2008 |
| 8 | Dec. 22, 2008 | L&L Quarterly Report (Form 10-Q) for quarter ended October 31, 2008 |
| 9 | March 23, 2009 | L&L Quarterly Report (Form 10-Q) for quarter ended January 31, 2009 |

All in violation of Title 18, United States Code, Sections 1350(c)(1) and (c)(2); and 2.

### COUNT 10
### (False SEC Filing)

71.     The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 26 and 28 through 67 of this Indictment as though fully set forth herein.

72.     On or about August 13, 2009, in Seattle, within the Western District of Washington and elsewhere, the defendant DICKSON LEE, together with others, did unlawfully, willfully and knowingly make and cause to be made statements in a report and document required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit:  DICKSON LEE filed and caused to be filed an annual report (Form 10-K) for the fiscal year ended April 30, 2009, pertaining to L&L, containing a Section 302 Certification attested to by DICKSON LEE representing that he had disclosed any fraud to the audit committee and the outside auditor involving management, whereas, in truth and fact, as DICKSON LEE well knew,

Indictment/Dickson Lee - 23

1  he knowingly did not disclose the fraud he perpetrated regarding N.L.'s role at L&L, and

2  instead actively mislead the audit committee and the outside auditor in order to cover up

3  the fraud.

4          All in violation of Title 15, United States Code, Sections 78m(a) and 78ff and

5  Title 18, United States Code, Section 2.

6

7                                    A TRUE BILL:

8

9                                    DATED:  1/29/2014

10

11                                   Signature of Foreperson redacted pursuant
                                     to the policy of the Judicial Conference of
12                                   the United States.

13                                   _____

                                     FOREPERSON
14

15

16  _____

17  JENNY A. DURKAN
    United States Attorney
18

19  _____

20  ANDREW C. FRIEDMAN
    Assistant United States Attorney
21

22  _____

    KATHERYN KIM FRIERSON
23  Assistant United States Attorney

24

25

26

27

28

Indictment/Dickson Lee - 24