The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

DICKSON V. LEE and
L&L ENERGY, INC.,

    Defendants.

Case No. CR14-24RAJ

**Dickson Lee's
Sentencing Memorandum**



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

**CONTENTS**

**Introduction**                                                          **1**

**Background**                                                            **2**

A.  Early life                                                             2

B.  L&L Energy                                                            2

C.  The offenses                                                          3

**Guidelines Issues**                                                     **3**

A.  A loss-amount estimate based on stock losses includes
    only losses attributable to the offense                               5

B.  L&L's stock lost most of its value for reasons other than
    Mr. Lee's offenses                                                    7

    1.  External factors such as the declining coal industry
        explain most of the drop in L&L's stock price                     7

    2.  Mr. Lee's offenses cannot have caused any of the
        stock price drop that occurred before they were
        made public                                                       9

C.  The answers to the leading questions on the
    Government's victim impact form are not reliable
    measures                                                             10

D.  The $3.5 million civil settlement does not provide a
    reasonable estimate of the loss caused by Mr. Lee's
    offenses                                                             11

**Sentencing Factors**                                                   **12**

A.  Mr. Lee is a fundamentally good person who has
    repented his mistakes and taken responsibility for his
    actions                                                              12

B.  Mr. Lee's frauds were motivated by his desire to keep
    L&L running smoothly, not personal enrichment                        15

C.  Defendants sentenced for fraud commonly receive
    below-Guidelines sentences                                           16

**Conclusion**                                                           **18**



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

**INTRODUCTION**

Mr. Lee is before this Court after pleading guilty to two counts of securities fraud. As the Court will find from U.S. Probation's Presentence Report (PSR) and materials provided by Mr. Lee, he is a caring and attentive son and a supportive father to his two infant sons. Friends, family, and colleagues alike attest to Mr. Lee's hard work, generosity, and the pride he has taken in fostering the Asian American business community. However, thoughtlessness and pride caused him to make serious missteps in the management of L&L Energy, Inc. Mr. Lee committed his offenses not to enrich himself, but in an effort to keep L&L running smoothly. He now realizes he has tarnished L&L, the company he has devoted 19 years to building, and deeply shamed his family. Mr. Lee has reflected on his errors over the months he has already been imprisoned.

The Government and Probation have recommended a Guidelines range of 41–51 months, and an above-Guidelines sentence based on suspicions Mr. Lee caused a large loss to L&L's investors. However, as the Government agrees, under the facts of this case the actual loss amount is complex and impractical to reasonably estimate with any accuracy. Given this uncertainty regarding loss amount, there is no basis to depart upwards from the Guidelines range. Instead, Mr. Lee's history of hard work, generosity, and the deep remorse he feels, justify a below-Guidelines sentence. Mr. Lee respectfully submits that a sentence of 24 months is sufficient punishment.[1]

---

[1] Based on his financial condition, Mr. Lee also submits that imposing no fine beyond a mandatory special assessment would be appropriate. The PSR gives Mr. Lee's net worth as –$2.88 million and notes he has no cash flow. PSR at ¶ 76. Mr. Lee's net worth is in fact less than that because the house at SE 225th Street in Kent, valued at $1.1 million, *see id.*, is half-owned by his daughter, Corrie Lee.



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

**BACKGROUND**

**A. Early life**

Mr. Lee was born in Nanjing, China in 1948. He is the third of five siblings. His family fled from China to Taiwan in the aftermath of the Communist takeover. Mr. Lee's parents instilled in the five children a strong work ethic and desire to succeed in life. As soon as Mr. Lee completed his undergraduate degree and mandatory military service, he left Taiwan to seek his fortune in this country. In 1986, he became a naturalized citizen of the United States.

**B. L&L Energy**

After initially working at restaurants and as a volunteer New York police officer, Mr. Lee eventually found employment as an accountant. He worked for a number of firms and companies, traveling often. In 1995 he formed his own company, L&L's predecessor. In 1999, L&L was incorporated in Nevada. At first, the company dealt in air compressors used in coal mining operations. Mr. Lee transitioned the company into coal mining itself, which promised greater opportunity for success.

As L&L grew, Mr. Lee strove to remake his small company into a legitimate publically traded concern. He began replacing L&L's board members, previously friends and family, with impressively credentialed independent professionals such as Dr. Syd Peng, a professor and chair of the Department of Mining Engineering at West Virginia University; and Jingcai Yang, former chief engineer of Shenhua, the world's second-largest mining company, and CEO of its largest subsidary. Mr. Lee found himself in the company of important business people and civic leaders. In 2008, L&L began preparations to apply for listing on NASDAQ.

AOKI LAW PLLC
720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

**C. The offenses**

L&L had previously been trading on the Over-the-Counter Bulletin Board, which operates under fewer regulations and does not require companies to have either a CEO or CFO. Mr. Lee assumed the role of CEO, and L&L's board appointed a CFO. However, the CFO resigned in 2008, after the board discovered he had misrepresented his qualifications. In May or June of that year, the company reached out to N.L., a former L&L employee, to act as interim CFO until a permanent replacement was found. N.L. did not immediately respond, and unexpectedly rejected the position in July. L&L hired a permanent CFO in 2009, and Mr. Lee concealed the period the company lacked a CFO. L&L did have a CFO by the time it was listed on NASDAQ, in February 2010. This conduct forms the basis for Count 1.

In 2011, L&L found it necessary to raise operational capital. Mr. Lee and the L&L board decided to sell shares through Chinese-based individuals, who would be able to receive L&L stock without the same reporting requirements as United States investors. The transfers were arranged by C.T., an L&L employee. The transfers, and the funds that returned to the company, were improperly booked. This conduct forms the basis for Count 2.

Mr. Lee was arrested on March 27, 2014, as he disembarked in Seattle from a flight returning from Taiwan. He pleaded guilty to Counts 1 and 2 on September 23rd of this year. He has been detained since his arrest.

## GUIDELINES ISSUES

The advisory range reached through application of the Guidelines is one of the seven factors the Court must consider for sentencing. 18 U.S.C. § 3553(a)(4); *United States v. Booker*, 543 U.S. 220, 226, 244–46 (2005) (making Guidelines range advisory instead of mandatory). Though the advisory sentencing range must be calculated, it may not be presumed reasonable. *Gall*



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

*v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009); *Rita v. United States*, 551 U.S. 338, 351 (2007). The touchstone of a reasonable sentence remains the parsimony clause—a sentence that is sufficient, but not greater than necessary, to accomplish the goals of sentencing as set out at 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

Mr. Lee agrees with the Government and U.S. Probation that the advisory range in this case is 41–51 months, based on an offense level of 22 and a criminal history category of I.[2] The parties also agree there should be no offense level enhancement due to loss amount because determining loss would be "too complex and impractical." Plea Agreement, Dkt. No 50, at 8:24. Probation concurs, noting the agreement "represents a reasonable settlement of a very complex question of law and fact." PSR at ¶ 38.

Despite admitting a loss amount could not be calculated, the Government will seek a long sentence based on its suspicion as to what the loss amount *might* be. The PSR suggests the loss amount could be estimated as high as $200 million to $400 million, based on the drop in the price of L&L's stock from its high water value, $14.29 in May of 2010, to its current value of approximately 8¢. This estimated loss amount range is offered as a possible basis for imposing a sentence greater than the 41–51 month advisory range.

But the parties' agreement is correct: loss amount in this case is impossible to reasonably estimate. Neither the Government's hunch, nor the $200 million figure, is a reasonable estimate that would justify exceeding the

---

[2] In 2003–04 and 2006–07, L&L sold a number of shares through an unlicensed broker. L&L settled these matters with financial regulators in Washington, California, New Mexico, and Connecticut. Though the PSR notes these matters under the "Other Criminal Conduct" section, they were administrative proceedings, not criminal charges. Mr. Lee has no criminal history.



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

agreed Guidelines range. This is true for two reasons: First, the timing of L&L's stock losses means most could not have been caused by Mr. Lee's offenses because the losses occurred before Mr. Lee's offenses were made public. Second, other factors suffice to explain most of L&L's decline.

### A. A loss-amount estimate based on stock losses includes only losses attributable to the offense

A reasonable loss amount estimate must reflect the loss actually caused by an offense. This is the loss causation principal. Loss causation originated in civil cases, but also applies to calculating loss amount for sentencing. *See, e.g.*, *United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009); *United States v. Ebbers*, 458 F.3d 110, 126–25 (2d Cir. 2006); *United States v. Olis*, 429 F.3d 540, 548–49 (5th Cir. 2005). Loss causation means "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines." *Olis*, 429 F.3d at 546. The loss amount does *not* include any part of the decline caused by other factors. *Id.*

The 2014 Guidelines reflect the loss causation principal when estimating a loss amount based on reduction in stock price:

> The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following: … *The reduction that resulted from the offense* in the value of equity securities or other corporate assets.

§ 2B1.1 cmt. 3(C)(v) (emphasis added). Financial economists also accept the loss causation principal, using a procedure called an event study to estimate the stock-loss attributable to a particular offense. Dr. Alan Hess is an economist and former professor at the University of Washington, whose experience includes preparing loss amount estimates for the Government in the Jeffrey


720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

Skilling prosecution and Angelo Mozilo insider-trading case. He describes the
event study process:

> The event study … is an empirical procedure that estimates
> the effects of changes in information on stock prices. … A
> typical event study uses a statistical procedure that
> estimates the effect of a specified news item on a
> company's stock price while taking into account the effect
> of news about all the other economic factors that might
> affect the stock price.

Report of Alan C. Hess, Ex. 4 to Aoki Decl., at ¶¶ 7, 9. If an event study fails to
consider other factors, "the resulting estimates of the effects of news about the
pertinent factor are biased and unreliable." *Id.* at ¶ 9.

Two considerations determine the effect a particular piece of information
will have on stock price: the *type* of information, and the *timing* of its revelation
to the public. The type of news that affects stock price relates to a company's
cash flow, the risks of the cash flow, or the present value of the company's
future cash flow (discount rate). *See id.* at ¶¶ 8, 11. Other news is "noise" that
will not affect stock price. *Id.* at ¶ 11.

Also important is the timing of the news:

> The effect of news on a stock price does not dribble out
> over a period of weeks or months. In an efficient market it
> is instantaneous and then complete.

*Id.* at ¶ 10. And because investors can only act on available information, news
cannot affect stock price *before* it becomes publically known:

> Any damages due to the actions [Mr. Lee admitted to]
> would have to be estimated as the decrease in price from
> the time the allegations were made public that are not
> attributable to other factors that affect the company's
> stock price.

*Id.* at ¶ 15. This analysis shows a reasonably accurate loss-amount estimate is
impossible in this case.



AOKI LAW PLLC
720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

**B. L&L's stock lost most of its value for reasons other than Mr. Lee's offenses**

**1. External factors such as the declining coal industry explain most of the drop in L&L's stock price**

Factors other than Mr. Lee's offenses likely account for most of the decline in L&L's stock. 2014 saw coal prices at "historic lows," with coal mining companies on the New York Stock Exchange down 29 percent in the last year alone.[3] This drop is not a recent trend—the coal industry is in a "prolonged slump."[4] Metallurgic coal, the type L&L mines, has lost two-thirds of its value since 2011:



*Actual and projected coal prices, in U.S. dollars per metric ton*[5]

This industry-wide drop follows a spike in coal price in 2010 and 2011—the same years L&L stock was at its peak. Indeed, the rise and fall of coal prices closely tracks the rise and fall of L&L stock:

[3] Timothy Puko, Matt Wirz & Matt Jarzemsky, *Hedge Funds Bet on Coal-Mining Failures*, Wall St. J., Nov. 23, 2014, www.wsj.com/articles/hedge-funds-bet-on-coal-mining-failures-1416790137.

[4] *Id.*

[5] Tristan Edis, *Two views on the state of coal's decline*, Climate Spectator, Dec. 16, 2014, www.businessspectator.com.au/article/2014/12/16/energy-markets/two-views-state-coals-decline

AOKI LAW PLLC
720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com



*Coal prices 2010–2014, in U.S. dollars per metric ton*[6]



*L&L closing stock price 2010–2014*[7]

This drop in coal price has caused other coal mining companies to struggle[8] or fail.[9] The same industry-wide factors explain most of L&L's stock drop.

[6] Trading Economics, www.tradingeconomics.com/charts/commodity-coal.png?s=coal&d1=20100101&d2=20141231 (accessed Dec. 9, 2014).

[7] Data downloaded from NASDAQ. *L&L Energy Inc Historical Stock Prices*, NASDAQ, www.nasdaq.com/symbol/llen/historical (5-year timeframe) (accessed Dec. 9, 2014).

[8] *See, e.g.*, Fayen Wong, *Struggling China coal producers try to boost prices for 2015 contracts*, Reuters, Dec. 4, 2014, www.reuters.com/article/2014/12/04/china-coal-idUSL3N0TO2UO20141204 (70 percent of coal mining companies in China are making losses).

[9] *See, e.g.*, Tim Loh, *Coal Mogul Murray Says More Bankruptcies Probable*, Bloomberg News, Sept. 23, 2014, www.bloomberg.com/news/2014-09-22/coal-mogul-murray-says-more-bankruptcies-probable.html (noting two coal mining companies that have declared bankruptcy since 2012).

AOKI LAW PLLC
720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

Factors specific to L&L, but separate from Mr. Lee's offenses, also likely contributed to L&L's decline. As mentioned in several victim statements, pump-and-dump stock manipulation by outside investment firms who acted independently of Mr. Lee had a severe impact on L&L stock:

> Manipulation by short sellers GeoInvesting, Glaucus Research, and others had a much more severe impact on this stock. After initially pumping L & L Energy's operation in China, they made a huge short purchase followed by a rash of wild accusations against the company, sending the stock into a tailspin.

Victim Impact Statement of K.I.; *see also* Email from J.B., Ex. 2 to Aoki Decl. (also noting short-seller manipulation by GeoInvesting and Glaucus); Victim Impact Statement of C.F.III (noting third parties "invented 'other facts' to profit at the expense of the small shareholders" and "continued 'pumping' of [L&L] stock"). These claims, regarding L&L's mining operations in China, were unrelated to Mr. Lee's offenses. In response, the SEC froze trading of L&L stock from November 2013 to April 2014. This outside stock manipulation and SEC trading freeze, which overlapped the date Mr. Lee was arrested, doubtlessly hurt L&L's stock price significantly.

### 2. Mr. Lee's offenses cannot have caused any of the stock price drop that occurred before they were made public

Almost all the decline in L&L's stock price occurred before Mr. Lee's offenses were made public. The initial Indictment, which alleged acts Mr. Lee pleaded to as the current Count 1, was only unsealed on March 27, 2014. *See* Dkt. No. 4. In Dr. Hess's opinion, the investing public could have learned the substance of the offense in Count 1 on August 2, 2011, based on a negative report regarding turnover of L&L's CFOs. *See* Hess Report at ¶ 13. However, any effect on stock price cannot be reliably untangled from seven other news

AOKI LAW PLLC
720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

events released the same day. *Id.* By the time the case was unsealed, L&L's stock price had already dropped to $1.68.[10]

The conduct underlying Count 2 was not made public until the Superseding Information was filed on September 23. Dkt. No. 46. None of the allegations were confirmed until Mr. Lee pleaded guilty, also on September 23. At that time, L&L's stock was already trading at around 11¢ per share. This means almost all of the drop from L&L's peak stock price must have been caused by factors other than Mr. Lee's offenses.

**C. The answers to the leading questions on the Government's victim impact form are not reliable measures**

All but one victim statement was made on questionnaires provided by the Government. The answers on these forms give a misleading impression of loss amount because the questions posed by the Government assume, from the outset, that all loss the shareholders suffered is attributable to Mr. Lee's offenses.[11] As discussed, L&L's drop in stock price is attributable to other factors such as the slumping coal industry and outside stock manipulation. Indeed, many victims attribute losses to factors such as inflated growth projections or stock manipulation by short sellers.

Further, though the Government's questionnaire asks whether each victim would have invested in L&L had they known about the offenses, it fails to ask the investors whether they relied on Mr. Lee's false statements when deciding to buy L&L stock. Hindsight is 20/20, but investors may not have

---

[10] As noted above, the unsealing of the case coincided with an unrelated trading freeze. It would be difficult or impossible to untangle the effects of the offense described in the initial Indictment and the current Count 1 from the effects of this freeze.

[11] It is also unclear that the victim's experiences are typical of L&L investors. One victim statement mentions a 98 percent loss, which exceeds the difference between L&L's high of $14.29 per share and the 8¢-per-share low noted in the PSR.

Sentencing Memorandum of Dickson V. Lee
Page 10


720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

placed as much weight on false CFO certifications or improperly booked stock transfers absent the Government's suggestion that these offenses caused the entirety of L&L's decline. As noted by Dr. Hess, information that does not bear on a company's "cash flows, the risks of the cash flow[,] or the company's discount rate" has little effect on actual investment decisions. *See* Hess Report at ¶ 11. L&L's financial performance and the health of the coal industry would likely have been given much more weight than the regulatory offenses Mr. Lee has admitted.

**D. The $3.5 million civil settlement does not provide a reasonable estimate of the loss caused by Mr. Lee's offenses**

Any loss amount used to determine an offense level under § 2B1.1 must be the loss caused by offense. § 2B1.1 cmt. 3(C)(v). It remains unclear whether any loss suffered by L&L investors is attributable to Mr. Lee—and thus relevant to his sentence. Possible loss amounts suggested by the PSR range from $200 million to $3.5 million, demonstrating the difficulty in reaching a reasonable estimate. But more importantly, the loss amounts offered by Probation also assume all loss is the result of Mr. Lee and not the downward trend of the energy market or the work of third-party marketers.

The $3.5 million settlement offered by Probation as an alternative benchmark for calculating loss was reached with shareholders in related civil lawsuits[12] and may be as probative as the $200 million estimate. *See* Addendum to PSR. The civil settlement likely represents a compromise position among the parties not only as to amount but also causation. Moreover, the civil case allegations do not exactly overlap the offenses to which Mr. Lee has admitted. At best, the large difference between $3.5 million and $200 million

---

[12] The settlement's approval is pending before the U.S. District Court for the Southern District of New York, Case No. 1:14-cv-03860-RA.



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

shows how unreliable any estimate will be but still does not address the issue of causation. As stated in Dr. Hess's report:

> [B]ased on the principles of finance as embedded in event study procedures, there currently does not exist a valid estimate of the damages due to the actions to which Mr. Lee has pleaded guilty.

Hess Report at ¶ 15.

## SENTENCING FACTORS

An appropriate sentence must reflect the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The sentence must be sufficient, but not greater than necessary, in light of factors including the need to provide just punishment, adequate deterrence, and protection to the public; the advisory Guidelines sentencing range; and the need to avoid unwarranted sentence disparities. *See id.* at (2). As discussed above, the Guidelines range should not be presumed reasonable, or given special weight. The Guidelines are especially unhelpful in this case, given the unique facts of this case. The other factors support how a sentence of 24 months is sufficient, reasonable, and just.

**A. Mr. Lee is a fundamentally good person who has repented his mistakes and taken responsibility for his actions**

Friends, family, and colleagues agree that Mr. Lee is a kind and hardworking man. He is supportive and generous with his family:

> His generosity, his effervescent passion for his work, and the attention he paid me as a teenager, adult and mother have made a lifelong impression on me.

Letter of Sonia Kurtz, Ex. 1 to Aoki Decl. at 2 (Mr. Lee's niece).

> Uncle Dickson is incredibly loyal, industrious, and warm-hearted. He has dedicated himself to providing care for my grandmother (his mother), whose health has been deteriorating for many years.

Letter of Dawn Kurtz Crompton, Ex. 1 to Aoki Decl. at 3 (Mr. Lee's niece).



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

> Dickson impressed me as a warm-hearted, energetic and generous young man who enthusiastically welcomed me to his country and his family. … My first impression of Dickson was confirmed repeatedly.

Letter of James W. Kurtz, Ex. 1 to Aoki Decl. at 4 (Mr. Lee's brother in law). In her recorded statement, Mr. Lee's sister, Linda Kurtz, also describes Mr. Lee's willingness to devote his time and attention to family members.[13] In addition to caring for his 94-year-old mother, Mr. Lee has been supporting his fiancée and twin infant sons. Letter of Rosemary Wang, Ex. 1 to Aoki Decl. at 5.

Beyond his family, Mr. Lee cares deeply about the Asian American business community. He has devoted much of his time and effort to supporting and fostering these communities, for example by donating time through the International Leadership Foundation (ILF):

> The ILF promotes economic opportunity, civic involvement, and public service among the Asian Pacific American community. … Dickson has worked very hard fundraising for the ILF, because he believes in instilling good citizenship in young Asian Americans. He is also involved in other charity organizations, always giving back to the community.

Letter of Shiao-Yen Wu, Ex. 1 to Aoki Decl. at 7 (CEO of WPI Real Estate Services & board member of the Greater Seattle Chinese Chamber of Commerce). Mr. Lee's passion for supporting the development of future civic and business leaders is also demonstrated by his donating and volunteering for his schools, Dalhousie University and Chung Yuan Christian University. *See* Letter of Peter G. Fardy, Ex. 1 to Aoki Decl. at 8; Letter of Wan-Lee Cheng, Ex. 1 to Aoki Decl. at 9. *See also* Letter of Johnson Wang, Ex. 1 to Aoki Decl. at 6 ("He often gives free seminars at universities on China's energy development to help the younger generations."). His activities in promoting business and civic engagement have been recognized by the President's Council on Service and

---

[13] Because Mr. Lee's brothers were employed by L&L, Mr. Lee has been unable to communicate with them since the company's indictment.



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

Civic Participation, which awarded Mr. Lee its Volunteer Service Award in 2011, and the United States Department of Commerce, which gave him a certificate of appreciation in 2008. *See* Ex. 3 to Aoki Decl.

Now, Mr. Lee realizes his offenses have hurt his family and endangered the community to which he devoted so much of his time. L&L, the company he founded and devoted 19 years of his life to, faces a criminal conviction. Mr. Lee will never again be allowed to act as a manager or CEO. *Id.* He fears his mistakes will tarnish the good name of the Chinese American community:

> People like to think all Chinese businesses are bad and I'm embarrassed that my conduct will reinforce people's stereotypes and prejudices.

Statement of Dickson Lee at 3.

Worse, Mr. Lee has had to confront the suffering he has caused his family. In her recorded statement, his sister describes the shock she felt at learning of his arrest, and of the sadness and confusion of Mr. Lee's mother and sons at being cut off from Mr. Lee. Mr. Lee has been cut off from his brothers, who were L&L employees, because L&L's counsel instructed them not to talk to him. *See* Statement of Mr. Lee at 3. Since Mr. Lee's arrest, "[t]he family has lost their happiness." *See* Johnson Wang Letter.

The burden is especially heavy on Mr. Lee's fiancée, Ms. Wang. She now has to care for their twin sons without Mr. Lee. One of the twins is autistic and requires additional care and nurturing. She writes:

> I've been worrying about the two toddlers' growth, Jonathan's medical conditions, Dickson's 95 year old mother and my own 85 year old mother. I have been overwhelmed, I cannot sleep at night. I need Dickson's help.

Rosemary Wang Letter. When deciding an appropriate sentence, the Court may consider the punishment Mr. Lee has already suffered from these harms to his reputation, business, and family. *See United States v. Anderson*, 533 F.3d 623



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

(8th Cir. 2008) (affirming downward variance based on "other ways in which the defendant had suffered atypical punishment" including loss of reputation, business, "and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system"); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1335 (D.N.M. 2007) (variance appropriate where defendant lost his position and reputation in the community); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (defendant's loss of his business justified downward departure).

Mr. Lee has had time to reflect on his mistakes. He has been detained at FDC SeaTac since his arrest on March 27, 2014.

> It is the longest I have been in one place for many years. During my captivity it has given me time to rest, repent, and meditate on my life. In prison, I was inspired by the good work of medical nurses and volunteers which made me humble and helped my transformation.

Statement of Dickson Lee at 2. Mr. Lee has taken time to help and encourage others at the FDC, including his former cellmate. *See* Letter of Ryan Yann, Ex. 1 to Aoki Decl. at 10. Mr. Lee's sister attests that he has become more humble and open. As noted by the Government and Probation, Mr. Lee has admitted to, and taken responsibility for, his wrongful actions. He has repented his crimes, expresses deep shame at the suffering he has caused, and already begun the work of reforming himself. These facts support imposing a lesser sentence.

**B. Mr. Lee's frauds were motivated by his desire to keep L&L running smoothly, not personal enrichment**

Mr. Lee's offenses were not the product of greed, but rather poor judgment. He built L&L up from a small company primarily staffed by family members, but found himself unprepared to helm the large, publically traded company it grew into. As he reflects, "I started to run before I could walk."

AOKI LAW | PLLC
720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

Statement of Dickson Lee at 1. This experience does not excuse his actions, but separates Mr. Lee's case from the worst frauds.

Unlike many frauds, Mr. Lee did not pocket investor proceeds or embark on a lavish lifestyle. Statement of Dickson Lee at 3. Instead, Mr. Lee committed his frauds in an effort to keep L&L running. The offense in Count 1 was an attempt to smooth the sudden resignation of L&L's CFO in May or June of 2008, and L&L in fact recruited a new CFO in 2009 or early 2010. Similarly, the improper stock transfers in Count 2 were intended to raise operating capital. Mr. Lee derived no direct financial benefit from either offense aside from his salary, much of which he loaned back to the company. Statement of Dickson Lee at 3. The company still owes Mr. Lee approximately $1.8 million from these loans, money that Mr. Lee has no hope of recovering. PSR at ¶ 74.

## C. Defendants sentenced for fraud commonly receive below-Guidelines sentences

Data collected by the U.S. Sentencing Commission confirms that below-Guidelines sentences for fraud are frequently imposed. Courts imposed below-Guidelines sentences for fraud 47.5 percent of the time, 23.8 percent of the time without Government sponsorship. Below-range sentences reached through consideration of 18 U.S.C. § 3553 factors were lower that the advisory range by a median 55.4 percent for fraud. Overall, the average sentence imposed under § 2B1.1 on an offender within Criminal History Category I was mean 17 months and median 6 months.

The above-Guidelines sentence the Government will recommend is based on the possibility that there may in fact be a high loss amount, though one that is impossible to accurately estimate, and that Mr. Lee may receive a windfall if his sentence is not increased accordingly. However, courts routinely sentence below the Guidelines range for fraud cases, especially when the Guidelines



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

range is driven by a high loss amount. This may partly be explained because the seriousness of an offense is also captured by other Guidelines factors such as number of victims, use of sophisticated means, and role in the offense. The willingness of courts to go below the Guidelines range is also understandable given the history of the Guidelines themselves.

Loss amount may weigh less as a sentencing factor because many of the offense levels for high loss amounts were adopted for reasons other than empirically based rationales or policies reflected in statute. *See Kimbrough*, 552 U.S. at 109; *Pepper v. United States*, 562 U.S. ____, 131 S. Ct. 1229, 1241 (2011). Nine offense levels for loss amounts over $10 million were adopted for policy reasons not grounded in statute or empirical evidence: a four-level increase in 1989, based on political grounds, and a five-level increase in 2001, solely to achieve parity with drug sentences that lacked empirical basis themselves. Jeffrey S. Parker & Michael Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 318–20 (1989) (describing the circumstances of the 1989 increase); Davis Debold & Matthew Benjamin, Essay, *"Losing Ground"—In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. Pa. L. Rev. PENNumbra 141, 145 (2011) (describing 2001 increase); *see also* U.S. Sentencing Guidelines Manual, amends. 99, 154 (1989), and 617 (2001).

Mr. Lee's case is unique in many respects: His offenses are regulatory crimes, which may have had little if any bearing on the loss suffered by L&L's investors. Any loss amount is speculative, and investors stand to be at least partially recompensed out of a pending civil settlement. Mr. Lee committed his offenses not out of greed, but out of a desire to keep L&L running. Mr. Lee himself is a man who regrets his actions and has already begun to reform



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

himself. A Guidelines sentence—or an above-Guidelines sentence based on what loss amount *might* be—would be out of step with common practices and unduly harsh in Mr. Lee's case.

## CONCLUSION

Dickson Lee is a fundamentally good man, who has endangered a lifetime of hard work and generosity through thoughtless mistakes. At 66 years of age, Mr. Lee ends his business career with a federal felony conviction, being publicly shamed, owing millions of dollars and facing a prison term. He is a subject of disdain to investors who, along with Probation and the Government, believe he personally caused the demise of L&L Energy. He has already spent most of a year in prison, cut off from his fiancée and infant sons.

The Government contends a lengthy sentence is appropriate because of the financial loss Mr. Lee caused investors. Yet, after an extensive investigation, the Government admits a loss amount cannot be practically calculated. Certainly, if any loss amount could be calculated, the Government would have done so as it has done dozens of times for other cases where it has proved critical to determining sentence and restitution. It cannot do so here.

Unsubstantiated loss estimates unfairly color the recommendations of both Probation and the Government. Only when the guesswork of financial loss has been removed from consideration can a fair sentence be imposed. Considering the unique factors of this case and Mr. Lee's character, an appropriate sentence of 24 months is sufficient.

///



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com

Dated this 2nd day of January 2015.

By:

*s/ Russell M. Aoki*
Russell M. Aoki, WSBA No. 15717
Attorney for Dickson V. Lee
AOKI LAW PLLC
720 Olive Way, Suite 1525
Seattle, WA 98101
T: 206 624-1900
F: 206 442-4396
russ@aokilaw.com



720 Olive Way, Suite 1525, Seattle, WA 98101
T: 206 624-1900 F: 206 442-4396
aokilaw.com