Hon. Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>DICKSON LEE,<br><br>　　　　　　　Defendant. | NO. CR 14-0024RAJ<br><br>UNITED STATES'S SENTENCING MEMORANDUM |

## I.  INTRODUCTION

Dickson Lee was the founder, Chairman of the Board, and CEO of L&L Energy, Inc. ("L&L"), a company engaged in the coal business in mainland China.  Lee is awaiting sentencing after pleading guilty to two counts of Securities Fraud in violation of Title 18, United States Code, Section 3148.

In February 2010, L&L succeeded in joining the ranks of thousands of household-name companies by qualifying to list its stock on the NASDAQ securities exchange.  The NASDAQ listing was significant for L&L and its CEO, and absolutely critical to the company's ability to attract and retain investment.  Prior to 2010, L&L was a risky "penny stock," trading on the illiquid over-the-counter market.  Investors also viewed L&L with skepticism since its business was based entirely in mainland China, outside the jurisdiction of U.S. regulators.  The NASDAQ listing, however, served to legitimize

1   L&L.  Companies listed on the NASDAQ must demonstrate, among other things, a
2   history of compliance with U.S. securities laws and regulations, including those regarding
3   corporate governance and internal controls.  Thus L&L's arrival on the NASDAQ
4   boosted the credibility of Lee and his company and brought immediate tangible benefits.
5   Soon after L&L achieved NASDAQ listing, the company's stock soared, so that by April
6   6, 2010, L&L's stock that historically had traded below $5 per share, rose to an all-time
7   high of $14.29 per share.  With approximately 28 million shares reported to be
8   outstanding, L&L could boast of a market capitalization exceeding $400 million.

9          The truth, however, was that Dickson Lee deceived both the NASDAQ and the
10  investing public about L&L.  L&L was not a well-regulated company with the requisite
11  internal controls and independent governance that investors depended upon to assure
12  accuracy in financial reporting.  Instead, L&L had no internal controls and Lee, alone,
13  dominated all aspects of the company.  This case revealed that in the year leading up to
14  the NASDAQ listing, Lee was sufficiently unchecked that he could fabricate the very
15  existence of a Chief Financial Officer, lie on SEC filings about the CFO, and then
16  successfully engage in a cover-up to prevent disclosure of the fraud to regulators.  Later,
17  when the company was desperate for cash, Lee secretly issued or transferred to nominees
18  more than half a million shares of the company's stock, and caused them to be dumped
19  on the unsuspecting market without disclosing that he was behind these sales and that the
20  company was then under SEC investigation.

21         The frauds committed by Lee are so brazen and unique, they have no known
22  precedent.  Moreover, the Sentencing Guidelines -- driven primarily by the notion of
23  direct economic loss to shareholders -- in this case fail to adequately capture the severity
24  of the conduct.  For purposes of the plea, the United States concedes that it cannot
25  reasonably establish pecuniary loss to investors as a result of Lee's conduct for reasons
26  further explained below.  In doing so, however, the government does not agree with the
27  defense's characterization that, therefore, Lee's crimes are merely "regulatory," resulting
28  in little harm.  It is not correct that investors care little about technical corporate

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

governance and internal control issues.  If the CEO of a company could successfully fabricate the existence of a corporate officer, and perpetuate the charade for months on end without anyone at the company raising questions, then everything that this company has reported, including its financials, is suspect.  Furthermore, if corporate executives are permitted to erect such facades without any real consequence, participation in the equity markets will become limited to only the wealthiest parties who have the wherewithal to conduct private due diligence.  In sum, Lee's actions show a deep contempt for the mom-and-pop investor, and left undeterred, will have profound negative implications for the integrity of the securities markets.  Accordingly, and for the reasons set forth below, the United States joins the Probation Office and recommends that Dickson Lee be sentenced to 60 months incarceration.

## II.    OFFENSE CONDUCT

The core of what happened in this case is no longer in dispute.  The following statement of relevant offense conduct is supported by Lee's own admissions as set forth in the Plea Agreement, the findings of the Presentence Report, publicly available filings with the Securities and Exchange Commission, and by evidence recovered during the course of the criminal investigation, including internal corporate email communications, corporate books and records, and statements of witnesses, relevant portions of which are either summarized herein or appended to this memorandum.

A.    **Background**

1.    *L&L Energy, Inc.*

According to the company's SEC filings, L&L was first founded in 1995 in Hong Kong by Dickson Lee as "Lee and Lam Financial Consultants Company, Ltd."  The company appeared to have originally provided investment consulting services.  In time, Lee and Lam were folded into other holding companies formed by Lee.

In 1999, Lee obtained a Nevada shelf corporation, Royal Coronado Co. Ltd. Royal Coronado was a shell corporation that conducted no business of its own.  In 2001, Royal Coronado became a registered SEC reporting company.  This meant that Royal

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Coronado was required to file publicly annual and quarterly reports detailing results of operations and financial conditions with the SEC, and if it maintained compliance, could offer its stock to the public through various stock markets.  Soon after its registration, Lee consolidated his consulting businesses and Royal Coronado acquired all the outstanding shares of what were then L&L's predecessor companies.  In 2008, the existing company changed its name to L&L International Holdings, Inc.  In 2009, the company assumed its current name, L&L Energy, Inc.

In 2008, L&L began to describe itself as a coal company, engaged in various aspects of the coal business including mining, washing, and wholesale distribution, all within the People's Republic of China.  While all of L&L's revenue generating operations was based in China, the company maintained a small U.S. corporate office in Tukwila, Washington.  The office permitted L&L to claim to be an American company in order to distinguish itself from other Chinese companies seeking access to U.S. equity markets.

The Tukwila office was staffed by a small number of young, rotating employees, many brought from China under temporary work visas, whose responsibilities included formatting and submitting the company's SEC filings.  The investigation revealed that all substantive accounting work and financial statements related to L&L's coal operations were performed and generated by individuals in mainland China, and that no one based in the United States had involvement in or access to the original books and records pertaining to the coal operations.  During the investigation, U.S. law enforcement officials were unsuccessful in contacting or obtaining the cooperation of any L&L employee that oversaw the accounting and financial work in China.

## 2.    *L&L's management.*

During all times relevant to this case, Dickson Lee controlled every aspect of L&L's operations, and no one else in the organization was willing or able to question his actions.  Lee held the formal offices of CEO and Chairman of the Board for most of L&L's history, with the exception of a one-year period from July 2007 through August

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2008. During that interim period, Lee voluntarily relinquished the titles of CEO and Chairman and installed his brother, Paul Lee.[1] Paul provided extensive information to the FBI during the course of this investigation. Paul explained that he was CEO in name only and that Dickson never relinquished control. Paul's experience at that time was confined to running a small insurance agency in the State of Michigan, and he had no understanding of what it took to run a publicly traded company. Paul was not even aware that his name was used to make SEC filings, and did not understand the import of those filings. According to Paul, Dickson Lee made all the decisions for L&L and the company's main operations took place in China with staff who did not question the boss.

### 3.    L&L's stock.

In 2008, L&L's stock was accepted and quoted on the Over-the-Counter Bulletin Board ("OTCBB"). The OTCBB is an electronic quotation system that displays real-time quotes, last-sale prices, and volume information for stocks of companies that are not listed on a national securities exchange. Once a stock is accepted for quotation on the OTCBB, the public can buy and sell the company's stock through a broker in a manner similar to those listed on the exchange. However, investors generally consider stocks listed on the OTCBB to be inherently risky, and trading is not very liquid. This limits a company's ability to raise capital. An OTCBB listing, however, can be used by companies to build a history of compliance and growth in share price to eventually qualify for listing on a national exchange such as the NASDAQ. But in order to maintain good standing with the OTCBB, the company must comply with all SEC filing requirements. Even delinquent filings can result in a company being removed from the

---

[1] The investigation showed that Dickson Lee installed his brother as temporary CEO in order to avoid having to disclose certain disciplinary actions that were being taken against him at that time by financial regulators. In 2007, Lee faced sanctions from FINRA, the regulatory body that oversees the securities broker-dealer industry, for involvement in deceptive sales practices connected to private placements of L&L stock. Lee was also under inquiry from numerous state financial regulators, including the Washington State Department of Financial Institutions (DFI), for the same incident. Rather than disclose these regulatory issues in L&L's SEC filings, as would have been required if he had remained an officer of the company, Lee chose to place his brother as executive until the inquiries were resolved and the sanctions period over.

1 | OTCBB, thus harming the company's standing with investors and chances for upgrading
2 | to a national exchange.

3 |        **4.**      ***SEC filing and certification requirements***.

4 |        As a company with a class of stock registered pursuant to the relevant securities
5 | laws, L&L was required to comply with the various laws, rules and regulations pertaining
6 | to the form and content of public disclosures.  L&L's continued quotation on the OTCBB
7 | and eventual listing on the NASDAQ also depended on L&L's compliance with these
8 | disclosure requirements.  Under the SEC's rules and regulations, registrants such as L&L
9 | are required to file on schedule certain annual (Form 10-K) and quarterly (Form 10-Q)
10 | reports that disclose to the investing public the company's current financial condition and
11 | results of operations.

12 |        As of 2002, SEC's rules and regulations furthermore required that every annual
13 | and quarterly report be accompanied by written certifications executed by the CEO and
14 | the CFO, or their equivalents, attesting to the accuracy and reliability of the contents of
15 | the reports.  The certification requirements were mandated by the United States Congress
16 | in the Sarbanes-Oxley Act, passed in the aftermath of cases like those involving the
17 | Enron Corporation.  Among other things, the purpose of the Act was to protect investors
18 | by improving the accuracy and reliability of corporate reports, and to ensure that
19 | executives are held personally responsible for the financial statements.

20 |        The Sarbanes-Oxley Act and its attendant SEC regulations require that each
21 | annual and quarterly report be accompanied by two separate certifications, known
22 | commonly as the Section 302 Certification and Section 906 Certification.  For the benefit
23 | of the Court, attached hereto as Exhibit A1 is the entirety of L&L's Annual Report for the
24 | fiscal year ended April 30, 2008, one of the filings at issue in this case.  The Sections 302
25 | and 906 Certifications are found on the last pages of Exhibit A1.  Attached as Exhibit A2
26 | are reproductions of each of the Section 302 and Section 906 Certifications from L&L's
27 | three Quarterly Reports that followed the April 2008 Annual Report, which are also at
28 | issue in this case.

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As the language contained in these Certifications demonstrate, in order for an officer to truthfully certify a report, he or she must be intimately involved in the process by which the reports are produced and reviewed for accuracy.  The Section 302 Certification requires the CEO and CFO, or their equivalents, to each affirm, in substance, the following:

a.      The attesting officer reviewed the report;

b.      Based on the officer's knowledge, the report does not contain any false or misleading statement material to an investor;

c.      The two certifying officers together are responsible for establishing and maintaining the company's internal controls and procedures to ensure that information material to investors is disclosed, and that financial statements are accurate; and

d.      The two certifying officers have disclosed any material weaknesses in the internal controls as well as any fraud that involves management.

The Section 906 Certification require the CEO and the CFO, or their equivalents, to each affirm in substance that the accompanying report complied with the applicable laws and regulations governing such periodic reports and that the information contained in the report fairly presented in all material aspects the financial condition and results of operations of the company.

These certifications and the accompanying reports are filed electronically with the SEC.  Therefore, the signatures appearing on the reports and the certifications are electronic and are not physical signatures.  Once filed, the reports are public and investors regularly rely on such reports to make investment decisions.

**B.      Offense Conduct – Count 1 – Fraud Concerning L&L's Chief Financial Officer**

*1.      Lee fabricates the existence of a CFO.*

Beginning in 2008, Dickson Lee was determined to upgrade L&L's status and qualify the company for listing on a national exchange such as the NASDAQ.  By then,

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Lee had become well-versed in the various requirements for NASDAQ listing, including
2  the fact that L&L had to maintain compliance with SEC reporting requirements.

3       In February 2008, as part of its preparation to make L&L a NASDAQ worthy
4  company, the company hired its first U.S. based CFO, Gene Bennett.  *See* Exhibit B1
5  (L&L Form 8-K, dated February 29, 2008).  Soon thereafter, allegations surfaced that
6  Bennett had inflated his credentials while serving on the Board of a different public
7  company.  *See* Exhibit B2 (email dated 3/14/2008).  When Lee attempted to solicit
8  funding for L&L from institutional investors, some refused to meet with Lee because of
9  L&L's association with Bennett.  *See* Exhibit B3( email dated 5/2/2008).  In May of
10 2008, L&L announced that Bennett resigned for personal reasons.  *See* Exhibit B4 (L&L
11 Form 8-K, dated May 7, 2008).

12      After Bennett's resignation, Lee faced continued pressure from prospective
13 institutional investors to have in place a CFO.  *See* Exhibit B5 (email dated 6/23/2008).
14 Finally, on June 23, 2008, Lee informed members of L&L's Board of Directors that he
15 intended to appoint Nicol Leung, a Hong Kong resident and a former employee with
16 L&L's predecessor company, in the position of Acting CFO.  *Id*.  The Board agreed to
17 the appointment without meeting or communicating with Leung.  *Id*.

18      What the Board did not know, however, was that Leung had not committed to the
19 job at the time Lee proposed her name.  And in July 2008, Nicol Leung emailed Dickson
20 Lee to finally decline the position.  *See* Exhibit B6 (email dated 7/14/2008).  Thereafter,
21 Leung did no work for L&L in any capacity.

22      Given his past interactions with investors, Dickson Lee knew that if he disclosed
23 that L&L continued to lack a financial officer, the company would risk continued
24 investor dissatisfaction and lose momentum toward his goal of a NASDAQ listing.  Lee,
25 therefore, chose to keep up the pretense that Leung was the CFO.   In furtherance of his
26 scheme, he caused staff to submit false and fraudulent SEC annual and quarterly reports
27 containing Sections 302 and 906 Certifications in Nicol Leung's name.  The following

28

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

filings contained the false and fraudulent statements and certifications regarding Nicol
Leung's role:

| Date of Filing | Submission |
|---|---|
| Aug 14, 2008 | L&L Annual Report (Form 10-K) for fiscal year ended April 30, 2008 |
| Sept 15, 2008 | L&L Quarterly Report (Form 10-Q) for quarter ended July 31, 2008 |
| Dec 22, 2008 | L&L Quarterly Report (Form 10-Q) for quarter ended October 31, 2008 |
| March 23, 2009 | L&L Quarterly Report (Form 10-Q) for quarter ended January 31, 2009 |

The above listed annual and quarterly reports are noteworthy in that during the
same time period in which Leung was falsely held out as L&L's CFO, the company also
reported some of the best financial results in its history.  In 2004, when L&L was still an
investment consulting company, it reported revenues of less than $600,000.  By fiscal
year-end 2008, when Leung was first falsely represented as L&L's CFO, L&L reported
total revenue of $32 million, an astounding result when considering L&L had only
recently refashioned itself as a coal company.  In the three subsequent quarters in which
Leung continued to be falsely presented as L&L's CFO, the company reported ever larger
revenues.  For the quarter ended July 31, 2008, L&L reported a 33% increase in revenue
from the prior year period.  For the quarter ended October 31, 2008, L&L reported a 30%
increase in revenues from the prior year period.  For the quarter ended January 31, 2009,
L&L reported a whopping 80% increase in revenue over the same period in 2008.

Given the reported growth, and in the absence of indication that anything was
amiss with the company, L&L's share price eventually climbed.  L&L debuted on the

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

OTCBB in August 2008, priced at $2.50 per share.  By the end of August 2009, L&L's

share price had risen to $5.20 per share.

### 2.    Lee pays Leung to cover up the fraud.

In about May 2009, Nicol Leung contacted Dickson Lee seeking payment of

compensation owed to her for her previous work with L&L's predecessor company.  *See*

Exhibit B7 (email dated 5/6/2009).  Leung's prior separation agreement included a

provision whereby she was to receive additional compensation when L&L became a

publicly traded company.  *Id*.  Apparently, however, during her research into L&L,

Leung discovered that the company had submitted annual and quarterly reports with the

SEC in her name with certifications that she never endorsed.  *See* Exhibit B8 (email dated

5/6/2009).  Leung informed Lee of her findings and eventually threatened to report the

matter to the SEC.

Initially, Lee was dismissive of Leung's threats.  Frustrated, Leung then contacted

Shirley Kiang, a member of L&L's Board of Directors regarding her findings.  *See*

Exhibit B9 (email dated 5/21/2009).  Shirley Kiang is a resident of Indonesia and was the

longest serving Director of L&L's Board.  Kiang knew Lee from school and considered

herself a loyal friend.  Kiang cooperated with law enforcement and in an interview

provided detailed information about Dickson Lee and Nicol Leung.  Kiang told

investigators that she eventually confronted Lee about Leung's accusations.  Lee

confirmed that he had simply used Leung's name in the filings, but convinced Kiang to

keep the matter quiet and not say anything to other Board members for the sake of the

company.  Lee assured her that he had the situation in control and argued that disclosing

the truth about Leung now would do more harm than good.  Kiang agreed to keep silent

and stood by while Lee quickly hired a new Acting CFO[2], Rosemary Wang, and entered

into an agreement with Leung to purchase her silence.  Lee agreed to pay Leung

---

[2]   In June 2009, L&L announced the appointment of Rosemary Wang as new Acting CFO without any mention of
Nicol Leung.  *See* Exhibit B10 (L&L Form 8-K. dated June 22, 2009).  As noted in the Presentence Report, Lee and
Wang entered into a romantic relationship shortly after her appointment as CFO.  Rosemary Wang is also the mother
of Lee's two young sons who are presently three years old.

1   approximately $50,000 (U.S.) and 115,000 shares of L&L stock in return for Leung

2   withdrawing all claims.  *See* Exhibit B11 (Agreement dated 7/30/2008).  Records

3   confirmed that Leung received the totality of the promised payments and neither the SEC

4   nor the investing public was ever informed about the fraud perpetrated by Lee.

5          ***3.      Lee misleads NASDAQ.***

6          Finally, with the Leung incident believed to be safely behind him, in September

7   2009, Lee made formal application to the NASDAQ to list L&L.  As part of the

8   application process, NASDAQ requested that L&L confirm in writing that the company

9   was in compliance with all SEC reporting requirements, including the submission of all

10  Sections 302 and 906 Certifications.  On approximately November 19, 2009, Lee

11  responded in writing and falsely assured NASDAQ that the company was in compliance.

12  *See* Exhibit B12 (Letter dated 11/19/2009).  As a result, in February 2010, L&L was

13  accepted for listing and L&L stock began trading on the NASDAQ.

14  **C.     Offense Conduct- Count 2 – Secret Share Sales**

15         ***1.      Requirement for accurate disclosures regarding company's stock***
16                 ***transactions.***

17         As a publicly traded company, L&L was required to keep accurate books and

18  records of all financial dealings, including information regarding transactions involving

19  the company's stock.  If new shares were issued or stock held in the company's own

20  Treasury are sold, the company was required to accurately account for such transactions

21  and report these transactions to the public via its annual and quarterly reports.  Moreover,

22  any sales of L&L stock controlled by the company's officers and other "insiders", were

23  also required to be disclosed.

24         Accurate and timely information regarding the company's and its officers' stock

25  transactions is necessary because the information is material to investors.  Each new

26  share issued by a company into the market impacts an existing shareholder by potentially

27  reducing or "diluting" the value of the stock held by that shareholder.  Moreover, the

28  reasons set forth by a company for issuing new shares or transacting in existing shares

Govt Sentencing Memo/Lee/                          UNITED STATES ATTORNEY
CR 14-0024RAJ - 11                             700 STEWART STREET, SUITE 5220
                                               SEATTLE, WASHINGTON 98101
                                                      (206) 553-7970

1  gives insight into the quality of the management and the health of the company. Finally,

2  large and sudden sales of company stock held by insiders can indicate a lack of

3  confidence or other problems at the company.

4      **2.      Lee fraudulently dumps company shares on the market without requisite**
          **disclosures and falsifies the company's books to hide the sales.**
5

6          In early 2011, L&L could not raise sufficient cash to fund corporate obligations.

7  Large institutional investment banks refused to back L&L. For example, in March 31,

8  2011, Lee, through his then assistant, reported to L&L's Board that one particular

9  investment bank refused to participate in any funding citing issues with L&L's

10  accounting and financial reporting. *See* Exhibit C1 (email dated 3/31/2011).

11          Unable to attract institutional capital, Lee explored the possibility of raising cash

12  by simply selling on the market L&L's own Treasury shares as well as his personal

13  shares. On May 18, 2011, however, L&L was served with a subpoena from the SEC

14  seeking records relating to the Commission's investigation of L&L and its financial

15  reporting. Subsequently, Lee was advised that neither he nor the company could sell

16  shares to investors without first disclosing to the public the fact that L&L had received an

17  SEC subpoena and was subject to an SEC investigation. *See* Exhibit C2 (email dated

18  5/28/2011).

19          Lee, however, chose to ignore the advice since disclosing such a negative action

20  would likely put additional pressure on L&L's already falling stock price. Instead, Lee

21  devised a scheme to secretly sell company shares through proxies in order to make it

22  appear the sales were not directed by the company and avoid further disclosure

23  requirements. In furtherance of the scheme, Lee directed an L&L employee, Candy

24  Tang, to recruit a number of individuals who would be willing to receive L&L shares in

25  their names for the sole purpose of selling those shares on the market to generate cash for

26  L&L.

27          Tang cooperated with law enforcement during the course of this investigation, and

28  in a series of interviews, provided detailed information regarding her involvement in the

L&L stock selling scheme.  Tang is a Taiwanese national, and was Lee's personal assistant.  In accordance with Lee's instructions, Tang first recruited an individual in California, J.L., who was willing to open brokerage accounts in the names of several of his Chinese relatives for the purpose of receiving and selling L&L stock.  Dickson Lee then authorized and caused L&L to issue brand-new L&L shares, or transfer existing L&L Treasury stock, in the names of J.L.'s relatives.  Once the share certificates were issued, Tang delivered them to J.L. who then sold them through various brokerage accounts.  The proceeds of the sales, minus a "commission" for J.L., were sent at Lee's direction to bank accounts associated with L&L.

In addition to J.L., Tang also facilitated the issuance and sale of additional stock through Lee's niece in Hong Kong, the niece's husband, and a number of other individuals in Taiwan.  Attached as Exhibit C3 is an example of an email communication between Tang, Dickson Lee, and Lee's niece, Katrina Lee, regarding the receipt and sale of L&L stock that was part of this scheme.

The total number of shares thus transferred and sold at Lee's direction between May 2011 and March 2012 equaled 730,000 shares.  The public was never made aware of these transfers and sales or the fact that Lee directed these sales.  Had they known, investors would have received indications that L&L faced severe cash flow problems and they would have questioned the continuing viability of the company.  Instead, Lee caused the creation of false records to disguise the share transfers to these proxies as compensation for services, or the result of private placement investments.  Attached as Exhibit C4 and C5 are examples of the false records Lee caused to be created to support the issuance of shares.  Exhibits C4 and C5 purport to be consulting agreements executed between L&L and Hao-Shu Lin and Yain-Reu Lin.  According to these consulting agreements, the Lins were entitled to receive 60,000 and 90,000 shares of L&L respectively in return for consulting services.  In truth, as Tang confirmed, Hao-Shu Lin and Yain-Reu Lin were relatives of J.L. and performed no work for L&L.  Lee caused

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  these false records to be created and ultimately provided to the company's accounting

2  staff and its outside auditor to provide false reasons for these share issuances.

3  **D.**   **Lee Obstructs the SEC Investigation**

4          On March 13th and 14th of 2013, Lee was deposed, under oath, by attorneys from

5  the SEC in connection with the agency's investigation into L&L's financial reporting.

6  During the deposition, Lee was asked about Nicol Leung's role and what duties she

7  performed for L&L during 2008 and 2009.  Lee knowingly and falsely testified that

8  Leung was the company's CFO and that he interacted with her as she performed the

9  duties of a CFO.  Attached hereto as Exhibit D1 are relevant excerpts of the SEC

10  Deposition Transcript of Dickson Lee, dated March 14, 2013.

11  **E.**   **History of L&L's Stock Price**

12          L&L's common stock first began publicly trading on the OTCBB on August 2,

13  2008, at $2.50 per share.  For the next several months, share prices dropped significantly.

14  Beginning in June 2009, however, L&L's stock finally began to rise.  On February 16,

15  2010, L&L closed its first trading day on the NASDAQ at $7.51 per share.  L&L's stock

16  then continued to climb until April 6, 2010, when it closed at the stock's all-time historic

17  high of $14.29.  Thereafter, however, L&L's stock price began a long and relentless

18  decline.  During this period, certain groups of investment analysts and other market news

19  outlets began publicizing doubts about the veracity of L&L's claims regarding its

20  ownership and operation of certain of its Chinese coal mines.  Analyst firms known as

21  "Glaucus Research" and "Geoinvesting" were especially aggressive in publicizing red

22  flags they believed were present in L&L's financials and disclosures.

23          On November 18, 2013, after more than three years of steady stock price decline,

24  NASDAQ unilaterally halted all trading in L&L stock due to failures by the company to

25  adequately answer inquiries regarding the company's ownership and operation of its

26  claimed Chinese mines.  At the time of the halt, the price of L&L stock had fallen to

27  $1.68.

28

On March 26, 2014, Dickson Lee was arrested at Seatac Airport after a flight from China and the Indictment against him was unsealed.  Trading in L&L stock had not resumed at this point.  On April 18, 2014, L&L voluntarily chose to delist from the NASDAQ.

### III.   SENTENCING GUIDELINES CALCULATIONS

The Sentencing Guidelines are advisory.  *United States v. Booker*, 543 U.S. 220, 245-46 (2005).  However, "the district courts still must consult [the] Guidelines and take them into account when sentencing[.]"  *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (internal citation omitted, internal quote omitted).  "The appropriate guidelines range, though now calculated under an advisory system, remains the critical starting point for the imposition of a sentence under § 3553(a)."  *United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005) (quoted approvingly in *Cantrell*, 433 F.3d at 1279).

Pursuant to the Plea Agreement, the parties agree and stipulate that the following Sentencing Guideline Calculations are applicable in this case:

| | |
|---|---|
| Base Offense Level<br>USSG § 2B1.1(a) | 7 |
| Specific Offense Characteristic<br>USSG § 2B1.1(b)(1)(A)<br>Loss less than $5,000 | +0 |
| Specific Offense Characteristic<br>USSG § 2B1.1(b)(2)(C)<br>Offense involved more than 250 victims | +6 |
| Specific Offense Characteristic<br>USSG § 2B1.1(b)(10)<br>Offense involved sophisticated | +2 |

| | |
|---|---|
| means | |
| Specific Offense Characteristic USSG § 2B1.1(b)(19)(A) Defendant was an officer of a publicly traded company | +4 |
| Adjustment for Role USSG § 3B1.1(a) Defendant was leader of a criminal activity that was otherwise extensive | +4 |
| Adjustment for Obstruction USSG § 3C1.1 Testified falsely in an SEC deposition | +2 |
| Acceptance of Responsibility USSG § 3E1.1(a) and (b) | -3 |
| **Total Offense Level** | **22** |

While the defendant plead to two separate counts of securities fraud, pursuant to USSG § 3D1.2(b) and (d), the two counts are combined into a single group. The above Total Offense Level, therefore, takes into account both counts of conviction.

## A.    Specific Offense Characteristic: Loss

The parties stipulate and agree for purposes of the Sentencing Guidelines calculations, that the total "loss" for both counts of conviction is less than $5,000. For the loss enhancement in § 2B1.1(b)(1) to apply, the government bears the burden of

proving by a preponderance of the evidence that the defendant's action caused actual pecuniary loss to victims. *See United States v. Berger*, 587 F.3d 1038, 1045, 1049 (9th Cir. 2009) (remanding for re-sentencing in a securities fraud case where district court failed to make a finding that defendant's conduct caused any shareholder loss). In securities fraud cases involving material misrepresentations by officers of a publicly traded company, the government must, therefore, demonstrate that the misrepresentations at issue in the case actually inflated the price of the company stock. *Id*.

Here, the United States cannot establish to any reasonable degree that Dickson Lee's criminal conduct actually inflated the price of L&L stock. Generally in securities fraud cases, the impact of a misrepresentation can be measured by taking note of the drop in stock price on the day the crime is disclosed. *See* Application Note 3(F)(ix) to § 2B1.1 (providing a formula for calculating loss in cases involving fraudulent inflation of stock). Here, the conventional method is not available since Lee's conduct came to light only years after intervening events had already caused L&L's stock price to decline precipitously. The charges against Lee were not unsealed until March 2014. By that time, L&L stock had fallen to less than $2 per share due to negative publicity unrelated to the criminal charges. Moreover, trading in L&L stock had already been independently halted for many months. Therefore, without a meaningful way to measure the impact of Lee's conduct on the share price, the United States recommends that the Court calculate the loss amount at less than $5,000.

By agreeing to a zero loss figure, however, the government does not mean to discount or dismiss the real harm inflicted upon the long suffering shareholders of L&L. As recounted in some of the victim impact statements forwarded to this Court, many investors lost significant amounts of their savings and retirement by trusting Lee through the years. At the same time, the government cannot ignore the reality that much of these investors' economic losses are likely the result of a confluence of different events that have put pressure on L&L stock price for most of its history, and are not readily

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   attributable to the charged conduct at hand.  As further argued below, however, the fact

2   that a monetary loss cannot be attributed to Lee's conduct does not mitigate the conduct.

3   **B.    Specific Offense Characteristic: Number of Victims**

4          Pursuant to the Plea Agreement, the parties agree and stipulate that the number of

5   shareholder victims in this case is in excess of 250.  The number of victim shareholders is

6   corroborated by the evidence in this case.  During the course of this investigation, the

7   SEC provided the FBI with an official record, commonly known as the "Bluesheets," of

8   all individuals who purchased L&L stock beginning August 2008 through August 2009,

9   the time period relevant to the fraud concerning the company's CFO.  The Bluesheets

10  noted just in that period of time approximately 2,300 unique names who invested in L&L.

11  **C.    Specific Offense Characteristic: Sophisticated Means**

12         The parties agree and stipulate that Dickson Lee's criminal conduct involved

13  sophisticated means.  From July 2008 through July 2009, Lee manipulated others into

14  believing that the company had a functioning financial officer, when in fact it did not,

15  and then engaged in a cover up.  Later, Lee successfully recruited others to sell on the

16  market corporate stock and then hid these sales by creating false records, without anyone

17  questioning his actions.  The extent and reach of Lee's conduct involved sophisticated

18  means.

19  **D.    Specific Offense Characteristic: Officer of Public Company**

20         The parties agree and stipulate that the securities offenses at issue in this case were

21  committed by an officer of a publicly traded company.  There is no dispute that L&L

22  Energy, Inc. was a publicly traded company as that term is understood by the Sentencing

23  Guidelines, and that Dickson Lee was its Chief Executive Officer at the time of the

24  commission of the offenses.

25  **E.    Role Adjustment: Leader of an Extensive Criminal Activity**

26         Pursuant to the Plea Agreement, the parties stipulate and agree that a four level

27  enhancement applies in this case as a result of Dickson Lee's role in the criminal activity.

28  Section 3B1.1(a) provides for the additional four levels where the defendant was a leader

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 18

1  of a criminal activity that was "otherwise extensive."  Application Note 3 to the

2  Guideline comments that in assessing whether a criminal activity is "otherwise

3  extensive," all persons involved during the course of the entire offense are to be

4  considered.  "Thus, a fraud that involved only three participants but used the unknowing

5  services of many outsiders could be considered extensive."  *Id.*

6        The enhancement is applicable in this case because the success of Lee's schemes

7  required the managing and manipulation of a number L&L employees, members of

8  L&L's Board of Directors, and a bevy of outside third-parties.  Lee's criminal activity

9  was, therefore, extensive and the highest role enhancement is appropriate.

10  **G.    Adjustment for Obstruction**

11        The parties stipulate and agree that the obstruction enhancement applies in this

12  case.  Dickson Lee lied in an SEC deposition about Nicol Leung's role at L&L in

13  connection with the agency's civil investigation of the company.

14  **H.    Acceptance of Responsibility § 3E1.1(a) and (b)**

15        The United States agrees with Probation that Lee has demonstrated acceptance of

16  responsibility for his own misconduct.

17  **I.    Applicable Sentencing Guidelines Range.**

18        Dickson Lee has no criminal history.  With a Total Offense Level of 22 and

19  Criminal History Category I, Defendant's applicable sentencing guidelines range is 41-51

20  months.

21                    **IV. SENTENCING RECOMMENDATION.**

22        The United States agrees with the Probation Office and recommends that Dickson

23  Lee be sentenced to 60 months incarceration, a term of supervision of three years, and a

24  $10,000 fine.  The recommended sentence is above the advisory Sentencing Guidelines

25  range.  The government submits that a higher sentence is warranted because the advisory

26  range in this case insufficiently accounts for the severity of the conduct.  The

27  recommended sentence is sufficient but not greater than necessary to satisfy the

28  applicable factors set forth in 18 U.S.C. § 3553(a).

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**A.     Nature of the Offense and Characteristics of the Defendant.**

A sentence must take into consideration "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  In this case, these factors support a significant sentence of incarceration.

Dickson Lee's conduct was particularly egregious because he flagrantly and repeatedly sought to undermine basic gatekeeping systems erected to prevent unaccountable corporate executives from fleecing investors.  After Enron and other large corporate accounting frauds damaged hundreds of thousands of investors, Congress saw fit to mandate safeguards by requiring corporate officers to be directly responsible for instituting internal controls so as to prevent and detect accounting frauds in the first place.  Lee, however, clearly placed little value on such laws and regulations and willfully and repeatedly flouted them.  In doing so, he betrayed a deep contempt for the regular investor.  The consequence of Lee's actions is continued mistrust by the public in corporate executives, erosion of confidence in the securities markets, and significantly higher investment costs as investors spend more to conduct their own due diligence.  This limits participation and the result is a less open and less liquid market to the detriment of the economy.

Lee's personal history and characteristics provides little mitigation for his conduct. Lee is an educated and experienced executive who clearly has amassed substantial wealth and property here and in China.[3]  Having had most every advantage in life, Lee yet chose to value expediency and self-preservation over honesty and integrity.  His conduct therefore warrants significant punishment.

**B.     Deterrence.**

Section 3553(a)(2)(B) requires that the sentence imposed reflect the "seriousness of the offense" and afford "adequate deterrence."  Dickson Lee's conduct strikes at the heart of basic safeguards imposed by Congress to restore integrity and confidence to the

---

[3] The Presentence Report noted Lee's current assets in the United States.  The government's information is that Lee also had, at least as of 2013, significant assets in China to include real property and bank accounts.

securities markets.  If conduct like Lee's is left undeterred, few will be willing and able to invest.

The issue of deterrence becomes particularly relevant in securities fraud cases committed by officers and executives of public companies because such crimes are notoriously difficult to detect and prosecute.  Where, as here, executives exercise tight control over their employees or conduct most of their operations overseas, false accounts and books will rarely come to light.  Indeed, in this case, Lee's fabrication of the existence of a CFO took several years before it was discovered.  Given the difficulty of detection, effective deterrence requires meaningful punishment.  As explained by Judge Richard Posner in *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994), "[c]onsideration of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."

This District abounds in publicly traded companies.  The opportunity and the temptation to cut corners, cook-the-books, and hide material information abound.  The sentence imposed against Dickson Lee will most certainly be noted by the public and especially by officers and executives who occupy similar positions.  We urge the Court to impose a substantial sentence so that the next Dickson Lee will be forced to think harder about the costs of engaging in this behavior.

**C.**     **Kinds of Sentences Available**.

No mandatory minimums apply in this case.  The offense carries a maximum statutory penalty of twenty years.

**D.**     **Sentencing Guidelines Range.**

The applicable Sentencing Guidelines range in this case is 41-51 months.  The government's recommendation of 60 months represents an upward departure from the advisory range.   The government urges this departure because the resulting range does not adequately reflect the severity of the defendant's conduct.  The sentencing range is a product of a Guidelines calculation heavily dependent upon a particular definition of

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   pecuniary loss, which, given the nature of the current case, results in an artificially low

2   offense level.  But in conceding the issue of loss, the government does not concede the

3   issue of harm.  Lee's conduct caused significant harm to L&L's investors in particular

4   and the market as a whole, and can cause even more harm if the Court fails to address the

5   conduct in a meaningful way.

6   **E.    Disparity.**

7          Section 3553(a)(5) cautions against creating unwarranted sentencing disparities

8   among similarly situated defendants.  Lee's conduct in this case is singularly unique and

9   the government does not know of another case in which an executive pretended to the

10  existence of another corporate officer, or used proxies to issue and sell company stock.

11  Given the severity and unique nature of Lee's crimes, the government submits that a 60

12  month sentence does not create any sentencing disparities.

13  **F.    Fine**

14         The United States joins the Probation Office in recommending the imposition of a

15  fine of $10,000.

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 22

## V.  CONCLUSION.

For the foregoing reasons, the United States respectfully requests that the Court sentence Dickson Lee to 60 months incarceration, 3 years of supervised release, and a $10,000 fine.

DATED this 2nd day of January, 2015.

Respectfully submitted,

Annette L. Hayes
Acting United States Attorney

s/Katheryn Kim Frierson
KATHERYN KIM FRIERSON
Assistant United States Attorney
WSBA # 3779
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone: (206) 553-7970
Fax: (206) 553-0755
E-mail: katheryn.k.frierson@usdoj.gov

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on January 2nd, 2015, I electronically filed the foregoing with

3

the Clerk of the Court using the CM/ECF system, which will send notification of such

4

filing to the attorney of record for Defendant.

5

6

7

s/ Jennifer J. Witt
JENNIFER J. WITT

8

Legal Assistant

9

United States Attorney's Office
700 Stewart Street, Suite 5220

10

Seattle, Washington 98101-1271

11

Phone: 206-553-2520
Fax: 206-553-2502

12

E-mail: Jennifer.Witt@usdoj.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Govt Sentencing Memo/Lee/
CR 14-0024RAJ - 24